T.C. Memo. 2005-205

UNITED STATES TAX COURT

JESSE M. AND LURA L. LEWIS,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 15673-87, 18551-88,    Filed August 29, 2005.
            29429-88.

     R determined deficiencies and additions to tax
against Ps and hundreds of other taxpayers who then
signed "piggyback agreements" with R, agreeing to be
bound by the outcome of selected test cases involving
tax shelter programs promoted by K.  Before trial of
the test cases, R's trial attorney, with his immediate
supervisor, entered into a secret settlement (not
disclosed to R's management, the attorney for other
test case petitioners, or the Tax Court) with D,
attorney for test case petitioners T, arranging refunds
to the Ts sufficient to pay D's attorney's fees as
consideration for the Ts' staying in the test case
array and T's testifying at trial.  After the Court
upheld R's determinations and entered decisions in
favor of R in the test cases, R's management discovered

───────────────

     [1]These cases have been consolidated for the sole purpose of deciding the motions currently before the Court.

the settlement and disclosed it to the Court.  The Court entered decisions in favor of the Ts in accordance with the settlement but allowed the adverse determinations against other test case petitioners to stand.  The other test case petitioners appealed the Court's decisions against them.

After R's management had discovered the settlement and disclosed it to the Court and while the other test cases were on appeal, R made a blanket settlement offer to Ps and other non-test-case petitioners that was less advantageous to taxpayers than the T settlement.  Ps accepted R's offer, and Ps' counsel and R signed stipulated decisions in accordance with the terms of the offer, which were entered as decisions by the Court.

The Court of Appeals ultimately held that the misconduct of R's attorneys in arranging and failing to disclose the settlement with the Ts constituted "fraud on the court".  It mandated that "terms equivalent to those provided in the settlement agreement with [the Ts] and the IRS" be extended to "appellants [test case petitioners] and all other taxpayers properly before this Court."  Dixon v. Commissioner, 316 F.3d 1041, 1047 (9th Cir. 2003), revg. and remanding T.C. Memo. 1999-101, supplemented by T.C. Memo. 2000-116.  Ps now seek to have their stipulated decisions vacated so they can become entitled to the benefit of the T settlement.

Held, because Ps and their counsel had become aware of the misconduct of R's attorneys and of the pending appeals by test case petitioners when they entered into their stipulated decisions, Ps are not entitled to have those decisions vacated.

Declan J. O'Donnell and Robert Alan Jones, for petitioners.

Henry E. O'Neill, for respondent.

MEMORANDUM OPINION

BEGHE, Judge: This matter is before the Court on petitioners' motions for leave to file motions to vacate stipulated decisions entered more than 12 years ago in the above-numbered dockets. The motions for leave, which have been filed, are accompanied by motions to vacate, which have been lodged. The issue presented by the lodged motions is whether stipulated decisions previously entered should be vacated because of fraud on the Court. We have followed our practice of examining the merits of the lodged motions in deciding whether to grant leave to file them.[2] We decide that the motions for leave to file motions to vacate should be denied.

Background

Petitioners' motions have been made in the context of the difficult, protracted, and ongoing litigation commencing with Dixon v. Commissioner, T.C. Memo. 1999-614 (Dixon II),[3] revd. and remanded sub nom. DuFresne v. Commissioner, 26 F.3d 105 (9th Cir. 1994), on remand Dixon v. Commissioner, T.C. Memo. 1999-101 (Dixon III), supplemented by T.C. Memo. 2000-116 (Dixon IV), revd. and remanded 316 F.3d 1041, 1047 (9th Cir. 2003) (Dixon V). For purposes of these motions, we take judicial notice of our

---

[2]See infra note 28.

[3]See infra note 10 regarding Dixon I.

findings in Dixon III and IV, as modified by Dixon V.  Otherwise,
the pertinent facts, as set forth in petitioners' motions and the
oppositions thereto, and as summarized in this "Background"
section of our opinion, are undisputed.[4]

Respondent determined deficiencies of $935 in petitioners'
Federal income taxes for their taxable year 1983, $3,523 for
their taxable year 1984, and $2,744 for their taxable year 1986.
For all 3 years, respondent also determined that petitioners were
liable for additions to tax for negligence or intentional
disregard of rules or regulations under section 6653(a)(1) for
1983 and 1984 and under section 6653(a)(1)(A) for 1986, with
increased interest under section 6653(a)(2) for 1983 and 1984 and

---

[4]Motions similar to those under consideration herein have
been filed and lodged by other taxpayers, most of whom were
represented by Messrs. O'Donnell and Jones when they settled
their cases and who continue to be represented by them in
connection with their pending motions.  In addition, similar
motions by still other taxpayers, some represented by Messrs.
O'Donnell and Jones and some represented by other attorneys, have
not been filed or lodged by the Court for technical reasons and
have been returned to the taxpayers' attorneys.

Still other motions have been filed and lodged on behalf of
taxpayers who signed stipulated decisions that were entered
before discovery and revelation of the settlements in the test
cases whose concealment was ultimately held in Dixon V to
constitute fraud on the Court.  In two such cases, Kahle v.
Commissioner, docket Nos. 24558-84 and 38976-84, in which the
stipulated decisions were agreed to and entered after publication
of the Court's opinion in Dixon II and before the discovery and
revelation of the Thompson settlement, respondent has conceded on
the record that the taxpayers are entitled to have their
stipulated decisions vacated so that they can become entitled to
the benefits of the Thompson settlement as mandated by the Court
of Appeals for the Ninth Circuit in Dixon V.

under section 6653(a)(1)(B) for 1986.[5]  For 1984, respondent also determined an addition to tax of $880.75 under section 6661 for substantial understatement of tax.

Petitioners, originally proceeding pro se, filed a petition in this Court on June 2, 1987, seeking a redetermination of the deficiency, additions to tax, and additional interest determined by respondent for the year 1983.  On July 18, 1988, petitioners filed a similar petition with respect to their 1984 taxable year, and on November 14, 1988, they filed their petition with respect to their 1986 taxable year.  When petitioners filed their petitions, they resided in Westlake Village, California.

The Kersting Project

The deficiencies, additions to tax, and interest stemmed from petitioners' participation in tax shelter programs promoted by Henry F.K. Kersting (Mr. Kersting).  Respondent issued the notices of deficiency to petitioners in furtherance of a project, called the Kersting project, that respondent had established regarding those programs.  Respondent also sent notices of deficiency to other taxpayers who had participated in the Kersting programs.  Ultimately, more than 1,800 cases arising from disallowance of deductions claimed by participants in the

---

[5]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Kersting programs were filed in this Court. Respondent assigned the role of Kersting project attorney to Kenneth W. McWade (Mr. McWade), an attorney in the Internal Revenue Service (IRS) District Counsel's office in Honolulu, Hawaii.

The Tax Court cases generated by the Kersting project were assigned to Judge William A. Goffe (Judge Goffe) for disposition.

Mr. Kersting took an active role in opposing respondent's enforcement activities against his tax shelter programs. In a letter dated March 1, 1985, Mr. Kersting informed Kersting program participants that he had retained attorney Brian Seery (Mr. Seery) to represent them in the Tax Court at no charge. After Mr. Seery entered his appearance in many of the Kersting project cases in this Court, he and Mr. McWade discussed settlement options for the cases, as well as procedures for trying them.

Respondent's Pretrial Settlement Offer

During 1982 through 1986, respondent had in effect an official settlement offer for the Kersting tax shelter programs. The offer permitted the participants to resolve their cases by agreeing to pay deficiencies that averaged 7 percent less than those determined in their deficiency notices. The 7-percent reduction of the deficiencies reflected a deduction equal to an average of the participants' actual out-of-pocket expenses in approximately 25 Kersting project cases. From respondent's

perspective, the 7-percent reduction settlement offer was equivalent to allowing a theft loss deduction in the year of payment.[6]

In addition to reducing the deficiencies by 7 percent, respondent's offer incorporated other concessions and adjustments:  (1) To concede the negligence addition to tax and increased interest imposed on tax-motivated transactions pursuant to section 6621(c); (2) to concede an annual deduction under section 162 or 212 for certain "leasing" program participants for expenses that exceeded the out-of-pocket adjustment; (3) to concede the deficiency in full to participants in one particular program who could show that funds paid to their children did not give rise to constructive receipt of income by the parents; and (4) to make appropriate adjustments if the participant had reported a capital gain upon the surrender of stock certificates to Mr. Kersting.  Respondent's purpose in offering these concessions and adjustments was to provide similar treatment for all Kersting program participants who wished to settle their cases.

Although District Counsel generally is expected to adhere to the terms of an official project settlement offer, once a tax

_____

[6]Respondent's position represented an additional concession insofar as the allowance of a theft loss deduction for payments induced by misrepresentation is postponed until the year of discovery of the theft.  See sec. 165(e); Bellis v. Commissioner, 61 T.C. 354, 357 (1973), affd. 540 F.2d 448 (9th Cir. 1976).

shelter project, such as the Kersting project, is assigned to a particular District Counsel's office, that office has the authority to settle any individual case in the project. District Counsel has the authority in special circumstances to settle individual tax shelter project cases on a basis different from the project settlement offer.

By September 1986, Messrs. McWade and Seery agreed to modify the 7-percent reduction settlement offer to incorporate a new feature they called the "burnout" in cases involving more than 1 taxable year. Under this feature, the interest on a taxpayer's total unpaid deficiencies for the first and second years of tax liability would not begin to accrue until the due date for the second year. The burnout thus postponed for a year the accrual of interest on the first year's deficiency and reduced the total interest that accrued on the deficiencies for both years. This was accomplished by zeroing out the taxpayer's agreed deficiency for the first year and adding it to the agreed deficiency for the second year.

The record does not disclose whether petitioners were aware of respondent's pretrial settlement offer; in any event, petitioners did not enter into a settlement before trial.

The Test Case Procedure

It would have been a daunting task to try the cases of the hundreds of similarly situated Kersting program participants who

did not accept respondent's pretrial settlement offer. In June 1986 Messrs. Seery and McWade addressed the problem by deciding to employ a test case procedure. Under that procedure, a few typical cases are selected as test cases, while the petitioners whose cases are not selected as test cases are encouraged to execute a piggyback agreement; i.e., a stipulation to be bound by the outcome of the test cases.

Petitioners and respondent entered into piggyback agreements providing that petitioners' cases would be resolved in accordance with the outcome of the final decisions in the test cases. The pertinent dates are as follows:

| Taxable Year | Docket No. | Dates of Execution Petitioners | Respondent | Date of Filing |
|---|---|---|---|---|
| 1983 | 15673-87 | Undated | 9/08/87 | 9/11/87 |
| 1984 | 18551-88 | 10/20/88 | 10/27/88 | 10/31/88 |
| 1986 | 29249-88 | 2/16/89 | 2/23/89 | 2/27/89 |

Petitioners, who were still proceeding pro se, signed their piggyback agreements. Mr. McWade signed petitioners' piggyback agreements on behalf of respondent.

Pretrial Proceedings in the Test Cases

Among those petitioners whose cases Messrs. Seery and McWade selected to be test cases were Mr. Seery's clients Jerry and Patricia A. Dixon (the Dixons), plus six other couples and an individual. The experience of the Dixons typified the experience of the other test case petitioners. The Dixons' deficiencies were for the taxable years 1977 through 1981 and totaled

$102,856. Respondent further determined that the Dixons were liable for negligence additions for 1977 through 1980 under section 6653(a) and for 1981 under section 6653(a)(1). The deficiencies and negligence additions so determined were attributable to their participation in Kersting tax shelter programs.

The test case petitioners also included John R. and Maydee Thompson (the Thompsons) and Mr. and Mrs. John R. Cravens (the Cravenses).[7] The Thompsons' deficiencies were for the taxable years 1979 through 1981 and totaled $79,293. Respondent further determined that the Thompsons were liable for additions to tax for negligence for 1979 and 1981 and for increased interest for 1981 pursuant to section 6621(d),[8] as well as a late filing addition to tax for 1981 under section 6651(a). The deficiencies, negligence additions, and increased interest were attributable to their participation in Kersting tax shelter programs. The Thompsons filed a petition in this Court seeking review of the deficiencies, increased interest, and additions, with Mr. Seery as their counsel.

---

[7]Mr. Seery particularly wished to include the Cravenses as test case petitioners because they treated their payments to Mr. Kersting to participate in the programs as basis reductions that resulted in their reporting capital gains on terminating their interests in the programs.

[8]Sec. 6621(d) was redesignated sec. 6621(c) by the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We will hereinafter refer to the provision as sec. 6621(c).

The Thompsons had previously hired another attorney, Samuel M. Huestis (Mr. Huestis), to prepare an estate plan for them. In a letter dated October 28, 1986, Mr. Huestis expressed concern to Mr. Seery about Mr. Seery's apparently close association with Mr. Kersting. Mr. Heustis said Mr. Seery could be viewed as having a conflict of interest between Mr. Kersting and the participants in the Kersting programs, and that any resulting harm to the Thompsons could result in an action against Mr. Seery for "professional negligence". On October 31, 1986, Mr. Seery filed a motion to withdraw as counsel for the Thompsons in their docketed cases, which the Court granted.

In ruling on a subsequent motion, Judge Goffe observed that Mr. Seery might have a conflict of interest if he represented both petitioners and Mr. Kersting. Mr. Seery subsequently filed motions to withdraw as counsel in the Kersting project cases (both test cases and nontest cases), citing concerns about a possible conflict of interest. The Court granted Mr. Seery's motions.[9]

---

[9]On Nov. 7, 1986, Mr. Seery had filed a motion to change the place of trial of the test cases from Maui to Honolulu. Mr. Seery asserted that a trial in Maui would be inconvenient and a hardship to Mr. Kersting, who lived and operated a business in Honolulu. On Nov. 14, 1986, the Court denied that motion, noting that the motion "implies that * * * [Mr. Seery] represents not only petitioners but also Henry Kersting, the promoter of the tax shelters which are the subject of this litigation." The Court went on to observe that, if Mr. Seery were representing both Mr. Kersting and petitioners, the dual representation would constitute a conflict of interest. The Court attached to the
(continued...)

Additional Attorneys Engaged by Mr. Kersting

Mr. Kersting then engaged attorneys Robert J. Chicoine (Mr. Chicoine) and Darrell D. Hallett (Mr. Hallett) to represent the test case petitioners. Messrs. Chicoine and Hallett agreed to do so with the understanding they would not represent Mr. Kersting. Early in January 1987, they entered their appearances for the Dixons and the other test case petitioners and promptly filed motions to suppress evidence seized in 1981 from Mr. Kersting's office.[10] Throughout 1987, Messrs. Chicoine and Hallett also negotiated with Mr. McWade to settle the test cases. They ultimately reached an oral agreement with Mr. McWade for a settlement in which respondent would concede 20 percent of the proposed deficiencies; in letters dated February 9, 1988, they disclosed this proposed settlement to the test case petitioners and to non-test-case petitioners who had inquired about the possibility of a more advantageous settlement. The proposed 20-percent reduction settlement displeased Mr. Kersting; on February 20, 1988, he wrote to Messrs. Chicoine and Hallett that "I hereby revoke your appointment as counsel for the test cases". In April 1988, Messrs. Chicoine and Hallett informed the test case

---

[9](...continued)
order copies of several authorities concerning conflicts of interest, including Adams v. Commissioner, 85 T.C. 359 (1985).

[10]In an Opinion dated Feb. 11, 1988, this Court held that it lacked power to suppress evidence seized from a third party not before the Court. See Dixon v. Commissioner, 90 T.C. 237 (1988) (Dixon I).

petitioners they would withdraw as counsel because of a disagreement with Mr. Kersting.  Mr. Kersting then engaged attorney Joe Alfred Izen, Jr. (Mr. Izen), to represent the test case petitioners at trial.

### The Thompsons Hire Mr. DeCastro

The Thompsons and the Cravenses did not engage Messrs. Chicoine and Hallett.  Instead, Mr. Huestis helped the Thompsons find attorney Luis C. DeCastro (Mr. DeCastro) as their replacement for Mr. Seery.  In November 1986, the Thompsons engaged Mr. DeCastro to represent them before this Court.  The Cravenses did not hire counsel to represent them in their test cases.  Thus, most of the test case petitioners, including the Dixons, continued to be represented by an attorney selected by Mr. Kersting.  The Thompsons and the Cravenses, however, continued as test case petitioners who were not represented by counsel engaged by Mr. Kersting.

### The Thompson Settlement

In December 1986, Mr. McWade and his supervisor, District Counsel William A. Sims (Mr. Sims), entered into contingent settlement agreements with the Cravenses regarding their test cases and with Mr. DeCastro regarding the Thompsons' test cases. For purposes of the present motions, only the details of the Thompson settlement are relevant, but we must describe it in some detail.  By December 1986, Mr. McWade had negotiated a settlement

with Mr. DeCastro calling for reduction of the Thompsons' total deficiencies from the $79,293 originally determined in their statutory notices to $64,425, a reduction of 18.8 percent.[11] The settlement also eliminated all additions to tax and the increased interest rate under section 6621(c) for 1981. The settlement also incorporated the burnout feature, combining the agreed deficiencies for the years 1979 and 1980 in the year 1980.

On December 23, 1986, Mr. McWade sent Mr. DeCastro decision documents incorporating the above-described settlement. The transmittal letter stated:

> As previously indicated, the Decision documents in John R. and Maydee Thompson will not be filed with the Court until the Decision becomes final in the test cases. In the interim, the Thompsons can make an advance payment, as discussed at our conference, and stop the accrual of any additional liability for interest.

Mr. DeCastro executed the decision documents on behalf of the Thompsons. Neither Mr. McWade nor Mr. Sims communicated the terms or existence of the Thompson settlement to their superiors in the Office of Chief Counsel.

On December 30, 1986, the Thompsons paid $59,545 as interest on their then-agreed deficiencies, timed to take advantage of the full deductibility of that interest for taxable years beginning

---

[11]Respondent later indicated that Mr. McWade's agreement to reduce the Thompsons' deficiencies by 18.8 percent reflected "increased litigation hazards caused by the Motion to Suppress Evidence" filed by Messrs. Chicoine and Hallett that was ultimately denied in Dixon I.

before January 1, 1987.  See TRA sec. 511(b), 100 Stat. 2246.
The payment was made with two checks, one of which, for $34,000,
was originally dishonored.  The Thompsons replaced the $34,000
check early in 1987.[12]  On June 15, 1987, pursuant to further
negotiations, the Thompsons paid the total proposed deficiencies
of $63,000, in order to halt further accrual of interest on the
deficiencies.[13]  By June 1987, their payments to the Internal
Revenue Service with respect to the taxable years 1979 through
1981 totaled $121,770.

Shortly before trial of the test cases in this Court in
January 1989, Messrs. McWade and DeCastro reached an oral
agreement (the new agreement) in the Thompsons' cases calling for
reduction of the agreed deficiencies for 1979, 1980, and 1981 to
zero, $15,000, and $15,000, respectively.  The purpose of this
reduction was to generate refunds to the Thompsons from the
$121,770 they had previously paid toward satisfaction of the

---

[12]In March 1987, Mr. McWade agreed to reduce the combined
deficiency of the Thompsons for 1979 and 1980 from $34,425 to
$33,000, bringing the reduction in total deficiencies to
approximately 20 percent.  The record does not disclose why Mr.
McWade agreed to that reduction, although similar 20-percent
reduction settlements were later offered to the clients of
Messrs. Chicoine and Hallett.  Mr. DeCastro communicated this
proposed reduction to his clients, but apparently he did not
execute decision documents confirming the Thompsons' acceptance
of this lowered amount.

[13]The Thompsons paid this amount with a check for $63,000;
respondent credited $775 to their taxable year 1988, a year not
then before the Court.  The balance of $62,225 was credited to
their liabilities for their taxable year 1979.

previously agreed deficiencies and interest.  The refunds, estimated to exceed $60,000, were to be used to pay Mr. DeCastro's fees in connection with the test case trial. Moreover, if the results of the trial were more favorable to the Thompsons than the new agreement, they would be entitled to the results of the trial.  On August 3, 1989, Mr. DeCastro wrote a letter to Mr. McWade, reducing the new agreement to writing.  Mr. McWade signed the letter and returned it to Mr. DeCastro.

When Messrs. McWade and DeCastro reached the new agreement, respondent's official settlement policy still provided for a 7-percent reduction in determined deficiencies, elimination of the negligence additions, and other minor concessions.  This was notwithstanding that some petitioners' attorneys, including Mr. DeCastro and Messrs. Chicoine and Hallett, had previously negotiated 20-percent reduction settlements on behalf of some of their clients.  The new agreement, however, reduced the Thompsons' determined deficiencies for the years at issue from $79,293 to $30,000--a reduction of 62 percent.  The new agreement was thus a much more substantial deviation from respondent's official settlement policy.  Messrs. Sims's and McWade's superiors did not approve the new agreement.  They did not discover the new agreement until after this Court had tried the test cases and issued its opinion and initial decisions therein.

Posttrial Proceedings in the Test Cases

On December 11, 1991, the Court, through Judge Goffe, issued its opinion in Dixon v. Commissioner, T.C. Memo. 1991-614 (Dixon II), sustaining almost all respondent's determinations that the Kersting programs in issue lacked substance for tax purposes.

In February 1992, Mr. Kersting sent a lengthy "Dear Friend" letter to the participants in his programs. He advised them:

> We came to talk about the escape routes open to essentially all of us as a result of the adverse decision in US Tax Court. There is first the road to San Francisco where we plan to point out to the 9th Circuit [Court] of Appeals the items of "reversible error" with which the Judges opinion is laced and the procedural flaws which had been disregarded by the Judge even though he was bound by law to take them into consideration. The appeal is being prepared by Joe Izen and shall be filed timely in due course.
>
>      *    *    *    *    *    *    *
>
> To my total exhilaration there was not a single voice of disgruntlement or dissent at either the meeting in Houston or Los Angeles. On the contrary, there was unanimous support for the appeal at the 9th Circuit [Court] of Appeals in San Francisco and for continuing efforts to right the wrong we have been subjected to in US Tax Court. * * *

Mr. Kersting's letter also warned the participants in his programs that "IRS soldiers * * * will begin another harassment campaign soon in order to break down your willingness to resist. It would be well within their character." Accordingly, he advised:

> In anticipation of this we have formed a defense team of attorneys who have indicated their willingness to provide the shield for you if you get singled out for

direct molestation.  I have met with the attorneys
several times over the last 10 days or so and I have
convinced myself of their skills and competency.
Moreover, they seem to have the most important trait in
dealing with the Revenue Service, namely fearlessness.
It is the distinction which makes the difference.  The
IRS is to us a formidable and threatening adversary.
We need the presence of someone who can provide the
balancing force and the element of stabilization.  I
will include with this letter a copy of the business
card of the attorney I have in mind.  * * *

The copy of the business card bore the name "R.A.J. Limited,
Robert Alan Jones, Esq., President".

Subsequently, Mr. Jones and attorney Declan J. O'Donnell
announced the "Henry Kersting Tax Defense Group".  A "Defense
Group" brochure, created in May 1992 and stamped "advertising
material", describes the legal services Messrs. O'Donnell and
Jones would offer to Kersting program participants.  The brochure
includes a description of the qualifications and practice
backgrounds of Messrs. O'Donnell and Jones, along with retainer
agreements and copies of relevant memoranda and correspondence.
One such memorandum, entitled "Status of the Kersting Cases", was
signed by Mr. O'Donnell and dated May 12, 1992.  It advised that
most of the Kersting program participants had executed piggyback
agreements to be bound by the results in the test cases.  It
stated:

    The Dixon case was decided for the Government and
against the six Petitioners.  The opinion of Judge
Goffe was filed on December 11, 1991, and the Appeal
deadline date is June 11, 1992.  Mr. Joe Izen of
Houston, Texas, represents the lead case Petitioners
and will handle the Appeal.  * * *

The memorandum further advised that Messrs. O'Donnell and Jones had "a Program to abate I.R.S. activity against its' [sic] clients until the dispute is finally resolved by Appeal. Enclosed herewith is a letter from Mr. Alan Jones to Mr. Kenneth McWade, IRS District Counsel, which establishes this treaty."

Another memorandum, dated May 18, 1992, entitled "Relationship to Henry Kersting", discussed Messrs. O'Donnell's and Jones's request to assist in preparing the taxpayers' appellate brief in the appeal of the test cases. It quoted a communication from Mr. Kersting to Mr. Izen as follows:

> Joe Izen - Joe - You probably know by the messages left at your office that Alan Jones and Declan O'Donnell have been trying to reach you for several days. They need to talk to you for all sorts of reasons as they are representing now a number of our mutual clients. Moreover, they have developed certain contributions to the Appeal to be filed at the Ninth Circuit Court of Appeals in San Francisco of which you should know as you are formulating the Briefs. I wish you would take the time and return their calls. Henry. 05/11/92.

In the meantime, in March 1992, this Court had entered decisions in the test cases in accordance with its opinion in favor of respondent. The test case petitioners (with the exception of the Thompsons and the Cravenses) appealed the decisions in their cases to the U.S. Court of Appeals for the Ninth Circuit.

After entry of the decisions in the test cases, Mr. McWade attempted to have respondent's Collection Division assess deficiencies in the Thompson and Cravens cases in accordance with

the previously undisclosed settlement agreements rather than in accordance with the decisions entered by the Court. Mr. McWade's attempts alerted senior officials in the IRS Regional Counsel's Office to the new agreement reached by Messrs. Sims, McWade, and DeCastro before trial. These senior officials determined that the new agreement was unauthorized. At their behest, on June 9, 1992, respondent filed motions for leave to file motions to vacate the decisions entered in the Thompson and the Cravens cases and one other test case.[14] Respondent requested the Court to conduct an evidentiary hearing to determine whether the agreements with the Cravenses and the Thompsons had affected the trial of the test cases or the ensuing decisions of the Court. On or about June 11, 1992, the IRS Regional Counsel decided that Messrs. Sims and McWade should be removed from the Kersting project cases, and that responsibility for the project should be reassigned to other District Counsel attorneys. The Deputy Regional Counsel reassigned all 15 test case dockets to Thomas A. Dombrowski (Mr. Dombrowski) and all the nontest cases in the project to Henry E. O'Neill (Mr. O'Neill).

On June 22, 1992, this Court granted respondent's motions to vacate decisions in the Thompson and Cravens cases. The Court ordered the parties to file agreed decisions with the Court, or

---

[14]In addition to the cases of the Thompsons and the Cravenses, respondent also sought to vacate the decision entered against test case petitioner Ralph J. Rina.

otherwise move as appropriate.  The Court denied respondent's request for an evidentiary hearing.  In a separate order filed the same date, the Court denied respondent's motion to vacate the decision filed in the case of Ralph J. Rina, the test case petitioner in docket No. 17640-83, stating:

> The Court has reviewed the testimony of Cravens, the testimony of Thompson, the stipulated facts and stipulated exhibits relating to the Cravenses and the Thompsons, and the exhibits offered through Thompson as a witness.  The Court finds that these reviewed items had no material effect on the opinion which the Court filed on December 11, 1991, as that opinion relates to petitioner Rina.  If the reviewed items were stricken from the record, the Court would file an opinion in all material respects like the opinion it filed on December 11, 1991 (with the exception of certain portions relating specifically and expressly to the Cravenses or the Thompsons), and the Court's findings, analyses, and conclusions relating to petitioner Rina would remain the same. * * *

Two days after the Court's order and decision denying the motion to vacate the decision in Mr. Rina's case, Messrs. O'Donnell and Jones wrote Mr. Dombrowski a joint letter, dated June 24, 1992, concerning further proceedings in the Kersting project cases.  In that letter, Messrs. O'Donnell and Jones informed Mr. Dombrowski that they represented "about one-hundred Petitioners" and that they understood Mr. Dombrowski had replaced Mr. McWade as respondent's counsel "because of an ethical concern regarding the impropriety of two settlement offers * * * secretly extended to Mr. Cravans [sic] and Mr. Thompson who testified for the I.R.S. at the Dixon Trial."

The letter further reported on the status of the cases as follows:

> The Motions for Leave to File Motions to Vacate were granted as to cases not on Appeal and a similar Motion (to remand rather than vacate judgment) is pending in the Ninth Circuit Court of Appeals as to the cases on Appeal.
>
> More recently, J. Goeffe [sic] has denied the Motion to vacate. He has decided that the newly disclosed "Contingent Settlements" would not change his ruling in any material way.

On July 6, 1992, Messrs. O'Donnell and Jones entered their appearances on behalf of petitioners in the present cases.

In a letter dated July 31, 1992, Mr. Kersting updated the situation for Kersting program participants. He advised that Mr. Izen and another attorney, Robert Patrick Sticht (Mr. Sticht), were "exposing the government's fraud and perfidy in a secret deal between Cravens and Thompson on the one hand, and IRS attorney McWade (and other government officials) on the other hand." Mr. Kersting explained his version of the misconduct of the Government's attorneys as follows:

> As many of you already know, the growing scandal in the "piggyback" cases involves a settlement in favor of Cravens/Thompson in exchange for their damaging testimony and exhibits that were all put together as part of a prearranged plan to influence and persuade Judge Goffe to rule against us. * * *

Also in July 1992, Mr. DeCastro filed a motion for entry of decision in the Thompson case reflecting the terms of the new agreement he had reached with Mr. McWade shortly before trial,

providing for deficiencies of zero, $15,000, and $15,000 for the taxable years 1979, 1980, and 1981, respectively. On August 20, 1992, respondent filed objections to Mr. DeCastro's motion for entry of decision, together with respondent's own motions for entry of decision and an accompanying memorandum. Respondent's motion papers set forth the facts regarding the Thompson settlement that had been discovered by IRS senior officials. Respondent informed the Court that, before the test case trial, Messrs. Sims and McWade had agreed to settle the Thompson cases by reducing the Thompsons' deficiencies in amounts sufficient to compensate them for their projected attorney's fees. As respondent explained to the Court, Messrs. Sims and McWade had agreed with Mr. DeCastro that:

> All settlement refunds in excess of the amounts provided by the December 1986 agreement would go ultimately to the benefit of Mr. DeCastro for payment of his legal fees and costs. Mr. DeCastro would be paid solely from amounts refunded by the Service to Thompson. * * * This "New Agreement", in sum and substance, if not explicitly, was designed, and constituted an agreement by Messrs. Sims and McWade to pay Mr. DeCastro's legal fees and expenses.

Respondent's motion papers maintained that the new agreement pursuant to which respondent would pay Mr. DeCastro's fees was unauthorized and had no legal basis. Respondent conceded, however, that the original 18.8-percent reduction settlement between Messrs. McWade and DeCastro on behalf of the Thompsons was valid and within the scope of District Counsel's settlement

authority.  Consequently, respondent asked the Court to apply the 18.8-percent reduction settlement to the Thompsons.[15]  The result for the Thompsons would have been deficiencies of zero for taxable year 1979, $34,425 for 1980, and $30,000 for 1981.[16]

Respondent's motion papers compared the amounts of the Thompsons' deficiencies originally determined for the 3 years at issue, totaling $79,293.52, with the unauthorized new agreement reducing the deficiencies to zero, $15,000, and $15,000, or total deficiencies of only $30,000, thus generating the refunds used to pay Mr. DeCastro's legal fees.  These figures, without more, indicate that the new agreement represented a 62-percent

---

[15]Respondent's motion papers explained that the December 1986 agreement between Mr. DeCastro and Messrs. Sims and McWade to reduce the Thompsons' deficiencies by 18.8 percent exceeded the terms of the standard 7-percent reduction settlement offer. Nevertheless, respondent conceded, "Respondent's counsel possessed the authority to make such an offer, and such offer was accepted by petitioners herein as well as others."  Respondent also noted an "approximately 20 percent" reduction settlement offer previously made to other participants.  Respondent did not revive the 20-percent reduction offer after trial.  See supra note 11.

[16]As things worked out, the final settlement of the Cravenses, who were not represented by counsel, was less favorable to them than respondent's modified 7-percent reduction settlement offer.  In particular, the Cravenses' correct tax liabilities for 1979 and 1980 were $4,508 and $5,893.45, respectively, for a total of $10,401.45.  The Cravenses' settlement, which was for $9,782.16, represents a reduction of 6 percent of the  deficiencies respondent originally determined. In addition, the Cravenses' settlement did not include the burnout feature.  On Aug. 25, 1992, this Court entered a decision for the stipulated total amount of the deficiencies, but the decision included the stipulation that certain advance payments made by the Cravenses had not yet been taken into account.

reduction of the deficiencies originally determined by respondent.

On August 26, 1992, the Court denied respondent's motion and held respondent to the pretrial concessions granted by Messrs. Sims and McWade in the new agreement as set forth in the August 3, 1989, letter agreement between Messrs. McWade and DeCastro. The Court granted Mr. DeCastro's motions for entry of decision in the Thompson cases as follows:

| Year | Deficiency | Additions to Tax |
|------|-----------|------------------|
| 1979 | --- | --- |
| 1980 | $15,000 | --- |
| 1981 | 15,000 | --- |

Respondent did not appeal this Court's decisions in the Thompson and the Cravens cases.[17]  As a result, the Cravenses and Mr. DeCastro's clients, the Thompsons, had their cases closed, while the other test case petitioners, who had appealed the decisions entered in their cases, added the newly revealed facts about the misconduct of respondent's attorneys to the grounds for their appeals.

On September 14, 1992, Mr. Kersting wrote another "Dear Friend" letter to the participants in his tax shelter programs,

---

[17]As noted above, this Court had also denied the motion to vacate with respect to petitioner Ralph J. Rina, and he appealed. Unlike the Thompsons and the Cravenses, Mr. Rina had no settlement agreement with Messrs. Sims and McWade.  On June 13, 1995, however, Mr. Rina agreed to entry of a stipulated decision in the amounts originally determined by respondent in his deficiency notice.

informing them of developments in the ongoing litigation.  He
said:  "I had reason to believe that the Appeal of Judge Goffe's
decision at the 9th Circuit [Court] of Appeals in San Francisco
was just around the corner.  It did not come about that quickly,
as you know."  Mr. Kersting noted the misconduct of Messrs. Sims,
McWade, and DeCastro in entering into and not disclosing the
Thompson settlement and added:  "It threw the appeals schedule
into turmoil and motions had to be filed to ask for an extension
of time for filing the Appeal."  Mr. Kersting advised:

> You had stipulated to go along with the outcome of the
> test cases including Thompson and Cravens which
> entitles you to ask for the same concessions arranged
> by the Revenue Service to Thompson and Cravens.  An
> arrangement whereby $100,000.00 of taxes allegedly owed
> were reduced to a mere $15,000.00.

This "Dear Friend" letter concluded by disclosing that
relations had soured between Mr. Kersting and the "Henry Kersting
Tax Defense Group" of Messrs. O'Donnell and Jones.  Mr. Kersting
explained:

> I anticipate that tension will build now between
> O'Donnell and our attorneys and me.  We are on a
> collision course which might lead to litigation.  There
> will be attempts by either Mr. O'Donnell or Mr. Alan
> Jones to alienate you from us.  Frequent efforts have
> been made already verbally.  Remind yourself that you
> are lined up at present with a proven legal team of Joe
> Izen and Butch Bradt.  They have kept the squeezers at
> the Revenue Service away from us for many years.  They
> will continue to protect us and lead us out of the
> quagmire eventually.  They will do it at a cost much,
> much less than projected by Mr. O'Donnell.

Shortly thereafter, Messrs. Izen and Sticht each filed a separate motion with the Court to intervene in the Thompson and Cravens cases. Mr. Sticht filed his motion in the Thompson cases on September 29, 1992, and in the Cravens cases on October 2, 1992. Mr. Izen filed his motions in both cases on October 27, 1992. Messrs. Sticht and Izen maintained they should be allowed to intervene in these cases in order to assert that Mr. McWade had committed fraud on the Court by arranging the Thompson settlement and failing to inform the Court or the parties.

In a subsequent "Notice to Apprise the Court of Petitioner-intervenors" served on November 5, 1992, Mr. Sticht identified Norman and Irene Cerasoli as petitioner-intervenors. At that time, Norman and Irene Cerasoli were being represented by Messrs. O'Donnell and Jones.[18] The Court denied the motions to intervene on November 6, 1992. Messrs. Izen and Sticht filed notices of appeal of the denials of their motions to intervene, again alleging fraud on the Court.

_____

[18] In a colloquy before this Court during a hearing following the remand by the Court of Appeals for the Ninth Circuit in Dixon V, Mr. Jones remarked that he had argued the existence of fraud on the Court earlier in these proceedings. Although he did not specify the occasion, we note that Mr. Jones represented the Cerasolis when Mr. Sticht had included their names as petitioner-intervenors in November 1992 and made his allegations of fraud on the Court. On Jan. 12, 1993, Mr. Sticht entered his appearance in the Cerasoli cases, adding his name to those of Messrs. O'Donnell and Jones. We also note that Mr. Jones argued fraud on the Court as a ground for vacating stipulated decisions in Richards v. Commissioner, T.C. Memo. 1997-149, supplemented by T.C. Memo. 1997-299, affd. without published opinion 165 F.3d 917 (9th Cir. 1998).

Respondent's Posttrial Settlement Offer

Early in January 1993, respondent made mass mailings extending a "global settlement" proposal to all known Kersting non-test-case petitioners, including those who had signed piggyback agreements. Respondent's letters to the Kersting program participants explained that, after the trial of the test cases:

> It subsequently came to our attention that two of the test case petitioners had entered into settlement agreements with the Service prior to the trial, and that these agreements were not disclosed to the Tax Court or the other test case petitioners. The settlement agreements provided that these particular test case petitioners could proceed to trial, but would receive the benefit of the better of their pretrial settlement agreement or the results of the trial. The Tax Court has since been advised of this situation and has concluded that the outcome of the trial was not affected by the testimony of these test case petitioners. This means that the Tax Court opinion, as it pertains to other Kersting cases, remains unchanged. However, in light of these recent developments, we have concluded that in fairness all petitioners be afforded an opportunity to settle their cases.

In general, the global settlement proposal contained in the January letters represented a revival of the official settlement that respondent had offered during 1982 through 1986. It permitted petitioners to resolve their cases by agreeing to pay deficiencies that were 7 percent less than those determined in their deficiency notices. Additionally, respondent would impose no penalties or additions to tax, and petitioners would pay interest only at the generally applicable (i.e., non-tax-

motivated) rate under section 6621(a).  The settlement offered by respondent in January 1993 did not include the burnout feature canceling the accrual of interest for the first year for which multiyear deficiencies had been determined.

Respondent's letters further stated:  "Acceptance of this settlement offer will preclude any further challenge or appeal with respect to the Kersting programs or the merits of the Dixon opinion."  The letter contained a "Sample Analysis" illustrating a hypothetical taxpayer who owed $20,000 in Kersting-related deficiencies for the taxable year 1985.  The analysis indicated that, if the taxpayer accepted the new 7-percent reduction settlement offer, he or she would owe a total of $36,388 in tax and interest.  However, if the taxpayer did not accept the settlement, the taxpayer would owe $67,901 under the piggyback arrangement as given effect in accordance with this Court's 1991 opinion.

Petitioners' Settlements

Respondent made the initial mass mailing on January 8, 1993, and sent copies to petitioners in the present cases.  Because counsel for various petitioners complained they had not received the settlement proposal letters, respondent remailed them to those counsel on January 29, 1993.  Respondent sent Mr. O'Donnell, as first counsel of record for petitioners in the present cases, copies of identical letters dated January 8 and

January 29, 1993.  Petitioners were given 60 days within which to accept or reject the settlement.  In a letter dated March 11, 1993, Mr. O'Donnell informed respondent's counsel, Mr. O'Neill, that petitioners herein had decided to accept the settlement proposal.  Thereafter, respondent forwarded a stipulated decision document to petitioners' counsel reflecting a disposition of these cases on the settlement terms set forth in the mass mailings.[19]  On May 17, 1993, Mr. O'Donnell signed the decision documents in docket Nos. 15673-87 and 18551-88; on May 18, 1993, Mr. Jones signed the decision document in docket No. 29429-88.  On June 16, 1993, Mr. O'Neill signed petitioners' decision documents on behalf of respondent.

The decisions entered in petitioners' cases reflected a reduction of the proposed deficiencies by 7 percent to $3,276 for 1984 and $2,552 for 1986; the stipulated deficiency for 1983 was reduced from $935 to $314, some $556 less than the $870 figure that would have resulted from a reduction of the original deficiency by 7 percent.[20]  The decisions provided there would be no additions to tax and that no part of the deficiencies

---

[19]Respondent extended the settlement proposal to all known Kersting non-test-case petitioners in mass mailings in January 1993.  Respondent reports that taxpayers accepted the proposal in approximately 400 cases.  Overall, between 1991 and the present, stipulated decisions were filed in approximately 750 Kersting project cases.

[20]The record does not explain this discrepancy, nor is it relevant for purposes of the pending motions.

constituted a substantial underpayment for which additional interest would be charged pursuant to section 6621(c).  On June 23, 1993, the Court entered the decisions in petitioners' three dockets.  On September 22, 1993, the decisions became final under section 7481.  Petitioners subsequently paid in full the liabilities assessed in accordance with those decisions.

Initial Appellate Proceedings

In the meantime, the appeals by test case petitioners represented by Mr. Izen were going forward.  On June 14, 1994, the Court of Appeals for the Ninth Circuit vacated the decisions in the remaining test cases on the ground that the misconduct of Messrs. Sims and McWade required further inquiry.  In a per curiam opinion, it observed:  "We cannot determine from the record whether the extent of misconduct rises to the level of a structural defect voiding the judgment as fundamentally unfair, or whether, despite the government's misconduct, the judgment can be upheld as harmless error."  DuFresne v. Commissioner, 26 F.3d 105, 107 (9th Cir. 1994) (hereafter DuFresne).  Accordingly, the Court of Appeals remanded the remaining test cases to this Court with directions "to conduct an evidentiary hearing to determine the full extent of the admitted wrong done by the government trial lawyers."  Id.  It further directed this Court to "consider on the merits all motions of intervention filed by parties affected by this case."  Id.

Notwithstanding the later opinion of the Court of Appeals for the Ninth Circuit in Dixon V,[21] vacating the decisions in the other test cases for "fraud on the court", the panel that issued the opinion in DuFresne entered separate orders on the same day dismissing Messrs. Izen's and Sticht's appeals of this Court's denials of their motions to intervene in the Thompson and Cravens cases. These orders explained:

> The Tax Court's August 25 and 26, 1992 decisions entering settlement in the Cravens and Thompson cases, respectively, are final. 26 U.S.C. § 7481(a)(1); Fed. R. App. P. 13. The Tax Court lacks jurisdiction to vacate those decisions. Billingsley v. CIR, 868 F.2d 1081, 1084 (9th Cir. 1989). Because there is no case remaining in which the taxpayers can intervene, this appeal is moot. [Adair v. Commissioner, 26 F.3d 129 (9th Cir. 1994) (No. 92-70812).]

Evidentiary Hearing After Remand of DuFresne

On September 30, 1992, Judge Goffe, who had presided over the trial of the test cases, terminated his recall status as a Senior Judge of this Court and retired from the bench. The Chief Judge of this Court reassigned the Kersting project cases to Judge Renato Beghe. Thereafter, to give effect to the direction of the Court of Appeals in DuFresne regarding intervention,[22]

---

[21]For a description of Dixon v. Commissioner, 316 F.3d 1041 (9th Cir. 2003) (Dixon V), and the events leading up to it, see infra under heading "The Second Appeal".

[22]In an order dated June 16, 1995, calendaring a preliminary hearing in the remaining test cases, this Court had caused a copy of respondent's motion for an evidentiary hearing pursuant to the mandate of the Court of Appeals in DuFresne v. Commissioner, 26

(continued...)

this Court ordered that the cases of 10 non-test-case petitioners, one docket represented by Mr. Izen, some represented by Mr. Sticht, and others by Messrs. O'Donnell and Jones, be consolidated with the remaining test cases for purposes of the evidentiary hearing mandated by the Court of Appeals in its DuFresne opinion.[23]

This Court conducted this evidentiary hearing at special trial sessions held in Los Angeles May 13 through 30 and June 10 through 26, 1996, and August 18, 1997. On the basis of the record developed at the evidentiary hearing, this Court, on March 30, 1999, issued its Supplemental Memorandum Findings of Fact and Opinion in Dixon III and entered decisions in the test cases. We held that the misconduct of the Government attorneys in the trial of the test cases did not, in the words of DuFresne, constitute a "structural defect" in the trial, but rather resulted in "harmless error". However, with a view to promoting basic fairness and justice in the Kersting project cases, and to discourage future Government misconduct, the Court exercised its

---

[22](...continued)
F.3d 105 (9th Cir. 1994), to be served on all attorneys who had entered appearances in the nontest cases.

[23]The group of cases that were consolidated for purposes of the evidentiary hearing initially included the case of William D. and Karyn S. Booth, docket No. 28950-88, in which Mr. O'Donnell had entered his appearance. However, at the start of the evidentiary hearing, the Court granted Mr. O'Donnell's motion to sever the Booth case from the cases consolidated for the evidentiary hearing.

inherent power and imposed sanctions against respondent. In particular, the Court held that Kersting program participants who had not had decisions entered in their cases, or whose decisions were not final, were relieved of liability for (1) the interest component of the addition to tax for negligence under sections 6653(a)(2) and 6653(a)(1)(B), and (2) interest computed at the increased rate prescribed in section 6621(c).

On June 24, 1999, the Court vacated its decisions in the test cases to consider the applications of attorneys Izen and Jones for fees and sanctions against respondent. After the test case and non-test-case petitioners who had participated in the evidentiary hearing, including those represented by Mr. Sticht, had filed numerous additional papers, the Court, on March 31, 2000, filed a Supplemental Memorandum Opinion as Dixon IV. The Court awarded in part the fees sought and denied the motions for additional sanctions. On the same date, the Court again entered decisions in the test cases. The test case petitioners filed timely notices of appeal from these decisions, again seeking review by the U.S. Court of Appeals for the Ninth Circuit.

The Second Appeal

On January 17, 2003, the Court of Appeals issued a second opinion in the test cases, Dixon v. Commissioner, 316 F.3d 1041 (9th Cir. 2003) (Dixon V), as amended on March 18, 2003, vacating and remanding this Court's decisions in the test cases other than

the Thompson, Cravens, and Rina cases.[24]  Citing Hazel Atlas Glass
Co. v. Hartford-Empire Co., 322 U.S. 238, 247 (1944), overruled
on other grounds Standard Oil v. United States, 429 U.S. 17, 18
(1976), the Court of Appeals held that "There can be no question
but that the actions of McWade and Sims amounted to a fraud on
both the taxpayers and the Tax Court."  Id. at 1046.  The Court
of Appeals held that "fraud on the court" occurs regardless of
whether the opposing party is prejudiced.  Id.[25]  Rather than
ordering a new trial or entering decisions eliminating all tax
liabilities of the taxpayers, the Court of Appeals directed that
"terms equivalent to those provided in the settlement agreement
with Thompson and the IRS" be extended to "appellants and all
other taxpayers properly before this Court."  Id. at 1047.[26]  The
Court of Appeals left to the Tax Court's discretion "the
fashioning of such judgments which, to the extent possible and
practicable, should put these taxpayers in the same position as

---

[24]See supra note 16.

[25]In Dixon v. Commissioner, 316 F.3d at 1046 n.9, the Court
of Appeals expressed disagreement with the contrary decision by
the Court of Appeals for the Seventh Circuit in Drobny v.
Commissioner, 113 F.3d 670, 678-679 (7th Cir. 1997), affg. T.C.
Memo. 1995-209.  In Drobny, the Court of Appeals for the Seventh
Circuit held that proof of fraud on the court requires a showing
that the alleged misconduct actually affected the outcome of the
case to the taxpayer's detriment.

[26]In setting forth the factual background and procedural
history of the Kersting project, the Court of Appeals noted
without comment that several hundred taxpayers had settled their
cases.  Dixon v. Commissioner, 316 F.3d at 1043.

provided for in the Thompson settlement." Id. n.11.  On April 18, 2003, in accordance with its opinion in Dixon V, the Court of Appeals for the Ninth Circuit issued its mandate reversing and remanding the Tax Court's decisions in the test cases.[27]

On February 20, 2004, petitioners Jesse M. and Lura L. Lewis filed and lodged the motions before us, seeking to have their stipulated decisions of 1993 vacated, and to have their cases reopened to enable them to obtain the benefits of the Thompson settlement, as mandated by the Court of Appeals, with respect to "appellants and all other taxpayers properly before this Court". They maintain they "were legally bound by the Dixon lead cases by virtue of a 'Piggy Back agreement' that requires consistent treatment and identifies them as group members".  They urge that the Court of Appeals' holding of fraud on the Court in Dixon V justifies granting them leave to file their motions to vacate.

On July 9, 2004, respondent filed objections to petitioners' motion to vacate.  Respondent argued that petitioners, by

---

[27] On July 11, 2000, shortly after the test case petitioners had filed their notices of appeal, this Court had certified certain dispositive orders in the nontest cases for interlocutory appeal, and appeals were taken in these cases.  In an order dated Mar. 14, 2003, another panel of the Court of Appeals for the Ninth Circuit remanded the cases of various non-test-case petitioners represented by Messrs. Izen, Sticht, Jones, and O'Donnell for further proceedings consistent with the opinion in Dixon V.  These nontest cases have been consolidated with the remaining test cases for the purpose of applying the outstanding mandates of the Court of Appeals for the Ninth Circuit regarding the terms, interpretation, and application of the Thompson settlement.

agreeing to stipulated decisions when they or their counsel were aware of the Government's misconduct, had rescinded their earlier piggyback agreement. Respondent urged that because petitioners made a "fully formed decision to opt out" of the Dixon litigation, they could not show that their decision to settle was caused by the previously disclosed fraud on the Court.

This Court directed petitioners to submit replies to respondent's objections, and petitioners did so on August 20, 2004. Therein, petitioners maintain that permitting them to reopen their cases and participate in the Thompson settlement would be "the only meaningful part of the sanction" mandated by the Court of Appeals. They also asked for a hearing on their motions in order to highlight alleged intimidation of Kersting project petitioners by respondent's agents.

On February 14, 2005, petitioners filed a supplement to their motions for leave. In the supplement, Messrs. O'Donnell and Jones address respondent's litigating position following the remand in Dixon V. They ask that respondent's litigating position be characterized as a proposed settlement that includes both a forgiveness of interest for the 12 years preceding 1992 and a reduction of 62 percent in the deficiencies determined by respondent. They then ask the Court to impose this proposed settlement summarily. Although we gave respondent leave to reply

to petitioners' supplement, respondent, on March 14, 2005, filed notices that he chose not to do so.

Discussion

The Court of Appeals for the Ninth Circuit has decided that Messrs. Sims and McWade committed fraud on the Court when they failed to inform this Court, their superiors, and the other test case petitioners and their counsel, of their settlement agreement with Mr. DeCastro on behalf of the Thompsons. Mr. McWade compounded that misconduct at the original trial before Judge Goffe by creating a diversion that prevented Mr. Thompson from revealing the settlement during his testimony. The Court of Appeals held that "the actions of McWade and Sims amounted to a fraud on both the taxpayers and the Tax Court" that "corrupts the adversarial nature of the proceeding, the integrity of witnesses, and the ability of the trial court to judge impartially." Dixon v. Commissioner, 316 F.3d at 1047. The Court of Appeals has vacated this Court's decisions in the cases of the test case appellants and directed that they "and all other taxpayers properly before this Court" receive the equivalent of the Thompson settlement. In so doing, the Court of Appeals noted without comment that several hundred taxpayers had settled their cases. Id. at 1043.

The opinion of the Court of Appeals constitutes the law of the case; under the law of the case doctrine, the decision of an

appellate court on a legal issue must be followed in all subsequent proceedings in the same case. United States v. Hughes Aircraft Co., 243 F.3d 1181, 1186-1187 (9th Cir. 2001); Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.), 77 F.3d 278, 281 (9th Cir. 1996). In accordance with the law of the case doctrine and the mandate of the Court of Appeals, there have been subsequent proceedings in this Court, including discovery, multiple sessions of an additional evidentiary hearing, and briefing by the parties, with the goal of "the fashioning of such judgments which, to the extent possible and practicable, should put these taxpayers in the same position as provided for in the Thompson settlement." Dixon v. Commissioner, 316 F.3d at 1047 n.11. For purposes of the motions now before us, it is obviously appropriate to assume that any "judgments" we may fashion pursuant to the Court of Appeals' mandate will be substantially more favorable to the affected taxpayers than if they had accepted and become bound by the 7-percent reduction settlement offered by respondent in January 1993.

In the present cases, petitioners ask us to vacate their stipulated decisions so that they can participate in the benefits to be generated by the subsequent proceedings mandated by the Court of Appeals in Dixon V. We shall not grant their request.

The undisputed facts relevant to petitioners' motions show they are not entitled to the benefits of the Thompson settlement.[28]

Absent certain narrow exceptions, discussed below, a decision of this Court based upon the parties' agreement to settle a case is final. The U.S. Supreme Court has stated the applicable principle: "There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from." Ackermann v. United States, 340 U.S. 193, 198 (1950) (ruling that strategic decisions not to appeal, made during the course of litigation, which in retrospect appear to be disadvantageous, do not provide a basis for posttrial relief).

In these cases, absent stipulation to the contrary, the venue for an appeal is the U.S. Court of Appeals for the Ninth Circuit; its holdings culminating in Dixon V constitute dispositive authority governing the cases of these petitioners. That court has expounded upon the finality of judgments and decisions not to appeal in Plotkin v. Pac. Tel. & Tel. Co., 688 F.2d 1291, 1293 (9th Cir. 1982):

---

[28]In deciding whether to grant a motion for leave to file motion to vacate a final decision, the Court's usual practice is to consider the merits of the underlying (lodged) motion to vacate decision to determine whether the moving party has alleged sufficient facts to call into question the validity of the decision. See Brannon's of Shawnee, Inc. v. Commissioner, 69 T.C. 999, 1002 (1978); see also Toscano v. Commissioner, 52 T.C. 295, 296 (1969), vacated on another issue 441 F.2d 930 (9th Cir. 1971); Campbell v. Commissioner, T.C. Memo. 1988-105.

Allowing motions to vacate * * * after a deliberate choice has been made not to appeal, would allow litigants to circumvent the appeals process and would undermine greatly the policies supporting finality of judgments.  Litigants unsuccessful at trial could forego available appeals and, should subsequent decisions in other cases render their positions viable, they could move to have adverse judgments vacated.  The uncertainty resulting from such a rule would be unacceptable.

Although Ackermann and Plotkin involved litigants' decisions not to appeal, their holdings also apply to motions to vacate. The U.S. Court of Appeals for the Fourth Circuit has explained:

We find no meaningful distinction between a motion asking for relief from a decision not to appeal, as in Ackermann, and one that asks for relief from a decision to settle, as in this case.  The decision to settle a case is made in the same manner as any other decision with respect to the course of litigation, including a decision not to appeal.  A litigant weighs the chance of success against the probable cost of achieving that success through further litigation, all based on whatever limited information is available at the time. * * *  [Schwartz v. United States, 976 F.2d 213, 218-219 (4th Cir. 1992).]

Thus, a party making "a conscious and informed choice of litigation strategy * * * cannot in hindsight seek extraordinary relief" from the consequences of that choice.  United States v. Bank of N.Y., 14 F.3d 756, 759 (2d Cir. 1994).  "To hold otherwise would undermine the finality of judgments in the litigation process."  Id. (citing Ackermann v. United States, supra, and denying a motion for relief from a consent decree entered pursuant to a settlement agreement).

The above authorities compel the conclusion that, in 1993, when petitioners settled their cases by agreeing to entry of final decisions of this Court, they abandoned any opportunity to benefit from the Court of Appeals' mandates in Dixon V, issued 10 years later.  Petitioners settled knowingly, with the advice of counsel who were intimately familiar with the events of the Kersting project litigation.  More to the point, they did so with the understanding, set forth explicitly in respondent's January 1993 letter, that accepting the settlement would "preclude any further challenge or appeal with respect to the Kersting programs or the merits of the Dixon opinion."

Under the applicable statutory provisions and rules, the time has long since expired within which petitioners might have sought relief from their choice to settle.  Section 7481(a)(1) provides the general rule that a decision of the Tax Court becomes final upon expiration of the time to file a notice of appeal.  Section 7483 provides that a notice of appeal generally must be filed within 90 days after a decision is entered.  The 90-day appeal period may be extended, however, if the taxpayer files a timely motion to vacate or revise the decision.  Fed. R. App. P. 13(a).  Pursuant to Rule 162, a motion to vacate or revise a decision must be filed within 30 days after the decision is entered, unless the Court allows otherwise.  A timely motion to vacate or revise the decision will cause the 90-day period to

run from the entry of the order disposing of the motion or from the entry of a new decision, whichever is later.  Fed. R. App. P. 13(a)(2).  Thereafter, as a general rule, the Tax Court lacks jurisdiction to vacate a decision that has become final.  Billingsley v. Commissioner, 868 F.2d 1081, 1084-1085 (9th Cir. 1989); Abatti v. Commissioner, 859 F.2d 115, 117 (9th Cir. 1988), affg. 86 T.C. 1319 (1986).

The strictness of the finality rules is intentional.  "The legislative history shows that Congress was conscious of the need that 'finality' be clearly defined, so that the process of collection can proceed unimpeded.  Court decisions, supporting this objective, have been strict in applying the statute."  Toscano v. Commissioner, 441 F.2d 930, 932 (9th Cir. 1971), vacating and remanding 52 T.C. 295 (1969).  The statutory framework finds support in the strong policy of finality in our decisions.  See Estate of Smith v. Commissioner, 123 T.C. 15, 28 (2004); Cinema '84 v. Commissioner, 122 T.C. 264 (2004), affd. 412 F.3d 366 (2d Cir. 2005); Taub v. Commissioner, 64 T.C. 741, 751 (1975), affd. without published opinion 538 F.2d 314 (2d Cir. 1976); see also Calderone v. Commissioner, T.C. Memo. 2005-151.  As the Court of Appeals for the Ninth Circuit explained, in affirming one of our decisions in Abatti v. Commissioner, supra at 119:  "Exceptions which would allow final decisions to be reconsidered must be construed narrowly in order to preserve the

finality of judgments." Accordingly, the authority of the Tax Court to act on a motion to vacate a decision that has become final is extremely limited. Cinema '84 v. Commissioner, supra at 270.

We have recently reviewed the limited exceptions to finality in Estate of Smith v. Commissioner, supra at 27-28. There, we observed the general principle that the finality of a decision is absolute. See Abatti v. Commissioner, 86 T.C. at 1323. We noted, however, that we have jurisdiction to set aside a decision where there is a fraud on the Court. See Toscano v. Commissioner, supra; Kenner v. Commissioner, 387 F.2d 689 (7th Cir. 1968); Taub v. Commissioner, supra at 751; see also Senate Realty Corp. v. Commissioner, 511 F.2d 929 (2d Cir. 1975).[29] In Toscano, the Court of Appeals for the Ninth Circuit explained the exception to finality for fraud on the Court by saying: "a decision obtained by fraud on the Tax Court can be set aside by it at any time because it is not a decision at all--a view

_____

[29]In addition to fraud on the court, there are some other narrow exceptions to finality. Thus, this Court and some Courts of Appeals have ruled that this Court may vacate a final decision if that decision is shown to be void, or a legal nullity, for lack of jurisdiction over either the subject matter or the party. See Billingsley v. Commissioner, 868 F.2d 1081, 1084-1085 (9th Cir. 1989); Abeles v. Commissioner, 90 T.C. 103, 105-106 (1988); Brannon's of Shawnee, Inc. v. Commissioner, 69 T.C. 999 (1978). We have also vacated a final decision where a clerical error was discovered after the decision had become final. Michaels v. Commissioner, 144 F.3d 495 (7th Cir. 1998), affg. T.C. Memo. 1995-294. There has been no suggestion that any of these other exceptions to finality applies in the cases at hand.

strongly supported * * * by the Supreme Court in <u>Hazel-Atlas Glass Co. v. Hartford Empire Co.</u>, 322 U.S. 238". <u>Toscano v. Commissioner</u>, <u>supra</u> at 933 (citing <u>Kenner v. Commissioner</u>, <u>supra</u>).

Petitioners' principal claim in these cases is that they were victimized by the fraud on the Court whose predicate facts were disclosed before they agreed to settle. They maintain that they were legally bound by the outcome of the test cases by virtue of their piggyback agreements and are therefore entitled to "consistent treatment". That consistent treatment, they maintain, is the "target or model settlement to be followed, i.e., the Thompson settlement". They conclude that "they should have leave of this Court to file appropriate papers that would include them in the remand group of <u>Dixon III</u>" (i.e., Dixon V).

Petitioners' claim ignores the legal consequences of their superseding agreements to settle. The compromise and settlement of tax cases is governed by general principles of contract law. See <u>Dorchester Indus., Inc. v. Commissioner</u>, 108 T.C. 320, 330 (1997), affd. without published opinion 208 F.3d 205 (3d Cir. 2000). A settlement stipulation is a contract. Each party agrees to concede some rights that he or she may assert against his or her adversary as consideration for other rights secured in the settlement agreement. See <u>Saigh v. Commissioner</u>, 26 T.C. 171, 177 (1956). Petitioners' agreement with respondent acted

"both as a rescission and a discharge by substitution" of their earlier piggyback agreements. 13 Corbin on Contracts, sec. 67.8(6), at 68 (Rev. ed. 2003). At the time of their settlement, the parties had a genuine dispute, which they resolved under conventional contract principles: respondent maintained that petitioners owed deficiencies totaling $7,202, plus additions and interest, and petitioners maintained they owed nothing. When petitioners settled, respondent's consideration to petitioners took the form of respondent's promises to accept 7 percent less than the deficiencies originally determined and to forgo the additions. Petitioners' consideration in return was their promise to pay the reduced deficiencies, plus their agreement, set forth explicitly in respondent's offering letter, that the settlement would "preclude any further challenge or appeal with respect to the Kersting programs or the merits of the <u>Dixon</u> opinion". The legal effect of their dealings "in substance, was a mutual surrender, by the parties, of their antithetical positions, in exchange for a new, formally executed, complete and binding contract." <u>Richards Constr. Co. v. Air Conditioning Co.</u>, 318 F.2d 410, 414 (9th Cir. 1963). As the Court of Appeals for the Ninth Circuit added in <u>Richards</u>: "Generally speaking, a contract to settle a genuine dispute is binding; the law favors such contracts; this was such a contract." <u>Id.</u> For the reasons

stated above, petitioners are not entitled to relief from the contracts by which they settled their cases.

Petitioners are no more successful with their related argument that, "Under this sanction [i.e., the Court of Appeals' mandate that the Thompson settlement be extended to all parties properly before that court] it would be unfair, inequitable, and more of a 'reward' than a 'sanction' to exclude settled petitioners." They urge that they "have paid in substantial monies and suffered damages to their legal rights equivalent to those who have withheld monies. Clearly, the Ninth Circuit would have decreed exclusion of settled cases in the event it considered their remedies not cognizable by this Trial Court." We disagree.

The Court of Appeals' direction that the equivalent of the Thompson settlement be extended to "appellants and all other taxpayers properly before this Court" by its terms excludes those who knowingly settled their cases after the predicate facts of the fraud on the Court were disclosed. The language of the Court of Appeals confirms our view that petitioners' legal predicament differs fundamentally from the posture of those who did not settle. Petitioners' cases are closed; in contrast, the cases of those who did not settle are still open. Under the doctrine of finality discussed above, we find no significance in the fact that the Court of Appeals did not specifically exclude already-

closed cases from its mandate.  To the contrary, we think that if the Court of Appeals had intended to extend the Thompson settlement to previously closed cases, it would have explicitly said so.

Before petitioners settled their cases, their legal situation was the same as those petitioners who did not settle; the cases of all such petitioners were open.  That prior similarity, however, does not entitle petitioners to the rights preserved by those Kersting project petitioners who did not settle.  The Court of Appeals for the Ninth Circuit rejected a similar contention in Abatti v. Commissioner, 859 F.2d at 117, where it held that some taxpayers in a tax shelter group who had signed piggyback agreements and failed to appeal adverse decisions in the test cases were not entitled to the relief gained by other piggybackers who did appeal the adverse decisions.  The Court of Appeals observed that there is "'no general equitable doctrine which countenances an exception to the finality of a party's failure to appeal merely because his rights are "closely interwoven" with those of another party.'"  Id. at 120 (quoting Federated Dept. Stores v. Moitie, 452 U.S. 394, 400 (1981)).

In addition to arguing that they retain the status of other non-test-case petitioners who rejected or did not respond to respondent's 1993 settlement offer, petitioners argue that the

circumstances of their agreements to settle justify relief from the finality of the resulting decisions.  They argue that they settled on the premise that "no fraud on the Court existed" and "that the Thompson scenario was harmless".  These arguments do not withstand scrutiny.

It is axiomatic that knowledge of the facts precludes a claim of fraud.  Soliman v. Phillip Morris, Inc., 311 F.3d 966, 975 (9th Cir. 2002); see Melanson v. United Air Lines, Inc., 931 F.2d 558, 563 (9th Cir. 1991) (fraudulent failure to disclose requires a plaintiff unaware of the concealed fact who would not have acted had he known of the fact); 37 C.J.S., Fraud, sec. 37 (1997) ("one can secure no redress for a representation which he knew to be false or for failure to disclose facts which he knew to exist").

Petitioners do not deny that, when they agreed to settle their cases, they had learned of the previously secret deal-- namely, that respondent's attorneys McWade and Sims had engineered a settlement with a party-witness in the test cases who thereby became entitled to the better of his settlement or the resulting decision of the Court.

There is ample evidence in the record that petitioners had become aware of those facts.  In July 1992, Mr. Kersting informed the Kersting project participants of the recently disclosed, previously secret McWade/DeCastro agreement.  Mr. Kersting

characterized that agreement as "the government's fraud and perfidy in a secret deal between Cravens and Thompson on the one hand and IRS attorney McWade (and other government officials) on the other hand." The misconduct, as Mr. Kersting described it, "involves a settlement in favor of Cravens/Thompson in exchange for the damaging testimony and exhibits that were all put together as part of a prearranged plan." In September 1992, Mr. Kersting advised the Kersting project petitioners who had signed piggyback agreements that they should demand "the same concessions arranged by the Revenue Service for Thompson and Cravens. An arrangement whereby $100,000.00 of taxes allegedly owed were reduced to a mere $15,000.00". He also informed the Kersting project participants of the progress of the appeals in the test cases: "I had reason to believe that the Appeal of Judge Goffe's decision at the 9th Circuit [Court] of Appeals in San Francisco was just around the corner. It did not come about that quickly, as you know." Mr. Kersting noted the misconduct of the Government's lawyers and added: "It threw the Appeals schedule into turmoil and motions had to be filed to ask for an extension of time for filing the Appeal."

In addition, all relevant information Messrs. O'Donnell and Jones had about the litigation of the test cases is attributable to their clients, petitioners herein. See Commissioner v. Banks, 543 U.S. ___, ___, 125 S. Ct. 826, 832 (2005); Veal v. Geraci, 23

F.3d 722, 725 (2d Cir. 1994) (relationship between attorney and client attorney represents is one of agent and principal); Morrow Crane Co. v. Affiliated FM Ins. Co., 885 F.2d 612 (9th Cir. 1989) (principal is deemed to know what agent knows concerning those matters in which agent has power to bind principal); 1 Restatement, Lawyers 3d, sec. 28 (1998) (information imparted to a lawyer during and relating to the representation of a client is attributed to the client for the purpose of determining the client's rights and liabilities in matters in which the lawyer represents the client).  Attorneys having such information are duty bound to communicate it to their clients.  See Phillips v. Woodford, 267 F.3d 966, 984 n.11 (9th Cir. 2001) (attorney must explain the matter in a manner reasonably necessary to permit the client to "make informed decisions" regarding the representation); Model Rules of Profl. Conduct, R. 1.4(a), cmt. 5 (2004) ("For example, when there is time to explain a proposal made in a negotiation, the lawyer should review all important provisions with the client before proceeding to an agreement"); 1 Restatement, supra, sec. 20 (a lawyer must keep a client reasonably informed about the matter and must consult with a client to a reasonable extent concerning decisions to be made by the lawyer).

On the documents before us, Messrs. O'Donnell's and Jones's awareness of the Sims/McWade/DeCastro misconduct can be traced to

June 24, 1992, when, on behalf of "about one-hundred Petitioners", Messrs. O'Donnell and Jones wrote to respondent, noting "an ethical concern regarding the impropriety of two settlement offers * * * secretly extended to Mr. Cravans [sic] and Mr. Thompson who testified for the I.R.S. at the Dixon Trial." The letter further advised of a motion to remand "pending in the Ninth Circuit Court of Appeals as to the cases on Appeal".

In August 1992, respondent presented a full report of the misconduct to this Court as it had been disclosed and developed at that time. Although this report was not served upon Messrs. O'Donnell and Jones directly, it came to the attention of Mr. Sticht, who joined them in representing the Cerasolis and who was aware of that report in September 1992. On September 29, 1992, Mr. Sticht's motion of petitioner-intervenors for leave to intervene stated:

> On or about August 20, 1992, the respondent filed its (a) Notice of Objection To Petitioner's Motion, (b) Motion For Entry Of Decision, and (c) Memorandum Of Points And Authorities * * * . Respondent's motion described the circumstances surrounding the previously disclosed "ostensible contingent settlement" * * * .

In January 1993, respondent sent two separate copies of the renewed 7-percent reduction settlement offer letter to petitioners, in care of their attorneys. In that letter, respondent informed petitioners that two test case petitioners had entered into settlement agreements with the Service before

the trial, and that their agreements had not been disclosed to the Tax Court or the other test case petitioners. Respondent further explained that the settlement agreements with those two test case petitioners provided that they could proceed to trial but would receive the benefit of the better of their pretrial settlement agreement or the results of the trial.

All the foregoing demonstrates that, when petitioners through their attorneys agreed to settle in March 1993, petitioners and their attorneys knew of the predicate facts that later gave rise to the holding of fraud on the Court by the Court of Appeals for the Ninth Circuit. This knowledge of petitioners and their attorneys precludes a claim of fraud that would vitiate the settlement stipulation from which petitioners, through those same attorneys, now ask to be relieved.

In view of the overwhelming evidence of actual knowledge, we are puzzled by petitioners' assertion that, at the time they settled, they thought no fraud on the Court existed. Perhaps their claimed unawareness means that they, or their attorneys, were unaware of the legal consequences of fraud on the Court. We would not be persuaded by an assertion to that effect. Rule 60(b) of the Federal Rules of Civil Procedure explicitly discusses "An action * * * to set aside a judgment for fraud upon the court." Moreover, Messrs. Izen and Sticht, counsel for other Kersting petitioners, explicitly alleged "fraud on the court" in

motions to intervene filed in September and October 1992, several months before petitioners' counsel executed their settlement documents, including a case in which Mr. Sticht and Mr. Jones were co-counsel. In view of this history, any assertion that, when petitioners agreed to settle their cases, they thought "that no fraud on the Court existed" is unpersuasive. When petitioners settled, they and their attorneys clearly had received enough information about the misconduct of the Government's attorneys to make an informed decision.

Petitioners have listed other circumstances surrounding their decision to settle, but none of these circumstances was the result of fraud on the Court or any other exceptional situation that would permit relief from their settlement. Thus, petitioners argue that when they settled, they thought the Thompson settlement was harmless. This appears to be an argument that when they settled, petitioners assumed or believed, despite the recently revealed misconduct of the Government's attorneys, that this Court's rulings of harmless error in favor of respondent would be upheld on appeal. That assumption or belief turned out to be erroneous; in Dixon V, the Court of Appeals for the Ninth Circuit reversed this Court's rulings of harmless error on the ground that "fraud on the court" occurs regardless of whether the opposing party is prejudiced. Dixon v. Commissioner, 316 F.3d at 1046. In any event, petitioners' mistaken assumption

or belief about the harmlessness of the Thompson settlement does not provide a basis for vacating their stipulated decisions. When parties make a deliberate, strategic choice to settle, they cannot be relieved of that choice merely because their assessment of the consequences turns out to be incorrect. United States v. Bank of N.Y., 14 F.3d at 759.

Petitioners also argue they settled because they feared worse results if they did not settle. Any worries they may have had about subsequent results, however, do not provide a basis for vacating the decisions in their cases. Concern about the outcome of litigation is not an extraordinary circumstance; it is a factor affecting one's evaluation of any settlement. The fact that the ultimate outcome would have been more favorable to petitioners than what they settled for is no reason to relieve them of their settlement agreement. See id.

Petitioners also contend no settlement other than the renewed 7-percent reduction settlement offer was available. That situation, however, was not created by any fraud of respondent; to the contrary, as far as the record shows, that contention is correct. Respondent's offer, made a few months after discovery of Messrs. McWade's and Sims's misconduct, was the only one on the table when petitioners accepted it in March 1993. That fact, however, does not entitle them to relief from their agreement to accept respondent's offer. As explained above, when petitioners,

with the advice of counsel, decided to settle their cases, they

knowingly assumed the risk that the ultimate outcome of the

nonsettling test cases on appeal would be more favorable than the

current settlement offer they were about to accept.

Petitioners have cited seven Courts of Appeals opinions as

"Precedent for the remedy of vacating a prior decision on the

grounds cited."  All those cases note that fraud on the court may

form a basis for vacating decisions of the Tax Court, or of a

U.S. District Court.  The proposition is unassailable.  None of

the cited cases, however, supports the proposition that a party

to a case who knows, or has reason to know, of circumstances in

the case that may be deemed to give rise to fraud on the court,

and who nevertheless agrees to a stipulated decision in that

case, may later obtain relief from that decision on the ground of

fraud.  These authorities do not help petitioners.[30]

Petitioners, after respondent's objection to their motions

for leave and motions to vacate, filed a reply to that objection.

In their reply, petitioners ask for a hearing on their motions,

noting that, in a pleading filed in 1992, respondent had conceded

that, in a hearing on the misconduct of the Government's

---

[30]Of the seven cases cited, only one supports a sanction of
any sort, on the basis of fraud.  See Aoude v. Mobile Oil Corp.,
892 F.2d 1115 (1st Cir. 1989) (case dismissed in view of
plaintiff's use of fraudulent documents and testimony).  This
suggests that the relief petitioners seek is even more
extraordinary than they would be willing to acknowledge.

attorneys, the Court may determine facts based upon "expected contradictory testimony." Respondent's concession of the need for a hearing, however, occurred before the evidentiary hearings in 1996 and 1997 on remand from DuFresne. Those hearings required more than 5 weeks of trial and produced hundreds of exhibits and thousands of pages of testimony regarding the misconduct of the Government's attorneys. The Court agrees with respondent that no further testimony is needed to enable the Court to decide petitioners' motions for leave.

Petitioners also ask for a hearing so that they might expose: "the scheme whereby CID alleged agents would call on investors to frighten them about a possible indictment against them, personally. Then a project attorney from Hawaii would call to offer not only the 7% settlement, but, also, certain freedom from the CID." This bare assertion is irrelevant to the present proceeding. The relief that petitioners seek in this case was mandated by the Court of Appeals as a result of Messrs. Sims's and McWade's failure to disclose the Thompson settlement, not as a result of alleged objectionable telephone calls by agents of the Internal Revenue Service. See Harbold v. Commissioner, 51 F.3d 618 (6th Cir. 1995).

Finally, petitioners' supplement to their motion for leave fails to supply any reason to grant the relief petitioners seek. In the supplement, Messrs. O'Donnell and Jones address

respondent's litigating position in response to the mandate of the Court of Appeals in Dixon V--in general, that the mandate requires a 20-percent reduction in deficiencies plus payment of actual attorney's fees--as a settlement offer. They then elaborate on the terms of that putative offer to their benefit, by assuming it contains both a forgiveness of interest for the 12 years preceding 1992 and a reduction of proposed deficiencies by 62 percent. They conclude by asking the Court to impose this settlement upon respondent. As we decided in an order in these cases dated February 24, 2005, we decline to be put into the anomalous position of compelling a settlement, especially when the "settlement" as set forth by Messrs. O'Donnell and Jones might most generously be construed to be no more than a counteroffer to a position articulated by respondent.

Following the remand in Dixon V, the remaining test case petitioners and a representative group of non-test-case petitioners who did not accept respondent's January 1993 settlement offer (including non-test-case petitioners represented by Messrs. O'Donnell and Jones) have made prodigious efforts to discover and introduce evidence that the Thompson settlement was actually more generous to the Thompsons than is apparent from its formal terms. Whether those efforts have been successful is irrelevant to our disposition of the pending motions for leave. The Thompson settlement as it had become known in 1993 has been

held by the Court of Appeals for the Ninth Circuit to constitute fraud on the Court and, hence, to justify entitlement by the litigants remaining before the Court to the benefits of the Thompson settlement as we finally determine and apply them.  Here petitioners, although aware of the predicate facts, deliberately gave up any right to participate in the benefits of that settlement.  Because of their decision to settle, petitioners' legal situation decisively differs from that of the other Kersting project petitioners who rejected or failed to respond to respondent's posttrial settlement offer.  By settling as they did, petitioners reduced their proposed deficiencies, eliminated all additions, stopped the further accrual of interest against them by paying the reduced deficiencies, and put an end to their participation in litigation that, to date, has lasted more than 12 years beyond the date they chose to settle.  When they did so, they also assumed the risk that, as a result of the appeals pending when they chose to settle, other Kersting project petitioners might become entitled to a more favorable outcome.

We conclude that petitioners' stipulated decisions are final, inasmuch as petitioners agreed to those decisions with the advice of experienced counsel.  At the time of the settlements, their counsel, who signed the decision documents, were aware of the misconduct that ultimately led the Court of Appeals to decide that such misconduct constituted fraud on the court.  Their

counsel were also aware that test case petitioners represented by Mr. Izen had appealed the Tax Court's decisions, which had sustained respondent's determinations despite the revelation of the misconduct of Messrs. Sims and Mcwade.  The finality of the stipulated decisions in petitioners' cases precludes them from participating in the relief mandated by the Court of Appeals in Dixon V to other Kersting project petitioners who did not accept respondent's January 1993 settlement offer.

In view of the foregoing,

<u>Orders will be issued denying petitioners' motions for leave to file motions to vacate decisions, as supplemented</u>.