T.C. Memo. 2009-124


UNITED STATES TAX COURT


LARRY L. HARTMAN, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent[2]


Docket Nos. 1371-85, 48690-86,    Filed June 1, 2009.
            4116-87, 15673-87,
            16761-87, 18551-88,
            29429-88.


Robert Alan Jones and Declan J. O'Donnell, for petitioner

Larry L. Hartman in docket Nos. 1371-85, 4116-87, and 16761-87

and for petitioners Jesse M. and Lura L. Lewis in docket Nos.

15673-87, 18551-88, and 29429-88.

---

[1]Cases of the following petitioners are consolidated
herewith:  Wilbert L.F. and Valarie W. Liu, docket No. 48690-86;
Larry L. Hartman, docket Nos. 4116-87 and 16761-87; and Jesse M.
and Lura L. Lewis, docket Nos. 15673-87, 18551-88, and 29429-88.

[2]This opinion supplements and amends Hartman v.
Commissioner, T.C. Memo. 2008-124, reconsidering and superseding
Lewis v. Commissioner, T.C. Memo. 2005-205.

Matthew K. Chung, for petitioners Wilbert L.F. and Valarie

W. Liu in docket No. 48690-86.

Henry E. O'Neill, for respondent.


SUPPLEMENTAL MEMORANDUM OPINION


BEGHE, Judge:  Pursuant to Rule 161,[3] respondent and

petitioners Larry L. Hartman (Mr. Hartman) and Jesse M. and Lura

L. Lewis (the Lewises) have filed motions for reconsideration of

our prior Memorandum Opinion Hartman v. Commissioner, T.C. Memo.

2008-124 (Hartman I), reconsidering and superseding Lewis v.

Commissioner, T.C. Memo. 2005-205.

Respondent's motion or motions for reconsideration comprise

four items under two headings:  The first and fourth items

concern issues of implementation and timing of the sanction

against respondent that we held in Hartman I would lead to

vacating stipulated decisions in Kersting project cases and

giving taxpayers in those cases the benefit of the "Thompson

settlement"; the second and third items embody respondent's

objections to the Court's characterizations of the actions of

respondent's management in formulating and proffering

respondent's posttrial settlement offer to Kersting project

---

[3]Unless otherwise indicated, Rule references are to the Tax
Court Rules of Practice and Procedure, and section references are
to the Internal Revenue Code of 1986 as amended.

petitioners and the Court's use of evidence in connection therewith.

The motion of Mr. Hartman and the Lewises for reconsideration reflects partial agreement with respondent's motion or motions regarding implementation of the sanction; their motion also requests extension of the sanction to Kersting tax shelter cases that were settled without being docketed in the Tax Court.

No motion objects to the Court's overall conclusion that stipulated decisions should be vacated to allow the taxpayers to obtain the benefits of the Thompson settlement.

In Hartman I we granted petitioners' motions to vacate the decisions entered in their cases, because of the misconduct of respondent's attorneys in implementing the test case procedure used by the Court and the parties in the Kersting tax shelter project.  See Dixon v. Commissioner, T.C. Memo. 1991-614 (Dixon II), vacated and remanded sub nom. DuFresne v. Commissioner, 26 F.3d 105 (9th Cir. 1994), on remand Dixon v. Commissioner, T.C. Memo. 1999-101 (Dixon III), supplemented by T.C. Memo. 2000-116 (Dixon IV), revd. and remanded 316 F.3d 1041 (9th Cir. 2003) (Dixon V), culminating with our disposition of the second remand in Dixon v. Commissioner, T.C. Memo. 2006-90 (Dixon VI),

supplemented by T.C. Memo. 2006-190 (Dixon VIII), on appeal (9th Cir., Dec. 28, 2006, and Jan. 3, 2007).[4]

In Dixon V the Court of Appeals for the Ninth Circuit held that the misconduct of the Government attorneys in the test case proceedings was a fraud on the Tax Court that violated the rights of all Kersting project petitioners who had agreed to be bound by the outcome of the test cases to be tried in the Tax Court.  As a sanction against respondent for the misconduct, the Court of Appeals mandated that "terms equivalent to those provided in the settlement agreement with * * * [the Thompsons] and the IRS" be extended to "Appellants [test case petitioners] and all other taxpayers properly before this Court".  Dixon V at 1047.

In Hartman I, applying the rationale and holding of the Court of Appeals in Dixon V, we held that the fraud on the Court committed by respondent's trial attorney and his supervisor in the test case proceedings constituted fraud on the Court in every

_____

[4]In Dixon v. Commissioner, T.C. Memo. 2006-97 (Dixon VII) and Young v. Commissioner, T.C. Memo. 2006-189, we responded to the supplemental mandate of the Court of Appeals for the Ninth Circuit in Dixon v. Commissioner, 316 F.3d 1041 (9th Cir. 2003) (Dixon V), revg. T.C. Memo. 1999-101 (Dixon III), to determine the appellate legal fees to which Kersting project petitioners and their counsel in Dixon V were entitled.  In Dixon v. Commissioner, 132 T.C. __ (2009) (Dixon IX), and Gridley v. Commissioner, T.C. Memo. 2009-89, we have acted on motions for attorney's fees and expenses incurred in the Dixon V remand proceedings by or on behalf of petitioners represented by attorneys of the law firm of Porter & Hedges LLP and by Robert Alan Jones.  Similar motions by petitioners represented by Michael Lewis Minns and Joe Alfred Izen, Jr., are pending.

case bound by the outcome of the test cases and that respondent had an obligation to fully disclose the misconduct, not only to the Court and the test case petitioners, but also to all petitioners who had been bound by the outcome of the Kersting project test cases. We held further that respondent's posttrial settlement offer did not adequately disclose the Government attorneys' misconduct to the offerees and did not remedy or purge the fraud from the Kersting project cases. We held that the sanction mandated by the Court of Appeals in Dixon V should be imposed in the cases of all Kersting project petitioners in which stipulated decisions were entered on or after June 10, 1985, the commencement date of implementing the test case procedure in the Kersting project. Our reference to Government attorneys in Hartman I and in this supplemental opinion is to respondent's trial counsel and his supervisor, and reference to the fraud on the Court is to the misconduct of those Government attorneys throughout the test case proceedings.

We believed that the most efficient way to implement the sanction would be to allow respondent to adjust administratively the accounts of all Kersting project petitioners, other than Mr. Hartman, the Lewises, and petitioners Wilbert L. F. and Valarie W. Liu (the Lius), without requiring further action from the Kersting project petitioners. It appeared to the Court that respondent could make such administrative adjustments as

evidenced by the fact that, after stipulated decisions became final in the cases of Kahle v. Commissioner, docket Nos. 24558-84 and 38976-84, respondent administratively had partially abated Mr. Kahle's agreed deficiencies by giving him the benefit of the 7-percent reduction in deficiencies provided in respondent's posttrial settlement offer.  In Hartman I we set forth a procedure to be implemented after the decisions in these cases become final that would give respondent 9 months thereafter to adjust administratively the accounts of all Kersting project petitioners against whom stipulated decisions had been entered on or after June 10, 1985.

## Background

For purposes of this supplemental opinion, we incorporate our findings in Hartman I.  For convenience and clarity, we repeat here the facts necessary to understand the discussion that follows, and we supplement those facts as appropriate.

Respondent determined deficiencies and additions to tax against petitioners and other taxpayers who participated in tax shelter programs promoted by Henry F.K. Kersting.  Respondent's determinations resulted in more than 1,800 cases in this Court arising from the disallowance of interest deductions claimed by Kersting program participants.  Most petitioners signed stipulations with respondent that their cases would be resolved

in accordance with the Court's opinion and decisions in the test cases (piggyback agreements).

After the trial of the test cases, the Court issued its opinion in Dixon II sustaining virtually all of respondent's adjustments. After the Court had issued Dixon II and entered decisions in the test cases, respondent's management discovered and disclosed to the Court and counsel for other test case petitioners that before the test cases were tried respondent's trial attorney Kenneth McWade and his supervisor had entered into secret settlements with test case petitioners John R. and Maydee Thompson (the Thompsons) and John R. and E. Maria Cravens (the Cravenses). The Thompson settlement provided for reduction of more that 60 percent of the Thompsons' originally determined deficiencies, as well as elimination of all Kersting-related penalties and additions, as a means of creating refunds to be paid to the Thompsons' counsel for providing the appearance of independent representation in the trial of the test cases. The Cravens settlement provided for reduction of about 6 percent of the Cravenses' originally determined deficiencies.

In July 1992 respondent's National Office began in-house discussions about offering Kersting project petitioners who were bound by the test cases through piggyback agreements a 7-percent reduction settlement along the lines of respondent's pretrial Kersting project settlement offer. The Department of Justice

informed respondent's management that the Department wished to offer the Kersting project petitioners whose cases were on appeal the same settlement that the Thompsons had received, estimated to be a 65-percent reduction in deficiencies (a rough approximation of the reduction of the Thompsons' originally determined deficiencies from $79,293.52 to the $30,000 figure finally agreed upon). Respondent's management was opposed to settling the appealed cases on that basis, and no settlement offer on that basis was made to the test case petitioners on appeal.

The first draft of the proposed settlement offer explained that the Tax Court had issued Dixon II disallowing the interest deductions, imposing additions to tax for negligence under section 6653 and substantial understatement of tax under section 6661, and finding that the increased interest rate under section 6621(c) applied. The first draft stated that five of the test case petitioners (Dixon, DuFresne, Hongsermeier, Owens, and Young) were appealing their cases in the Ninth Circuit, but that the appeals had not yet been resolved. The first draft further stated that respondent had moved to vacate the decisions in the Cravens, Rina, and Thompson test cases because settlement agreements had been reached with the Cravenses and the Thompsons, who were test case petitioners, before the test cases were tried. The first draft stated that the Tax Court had (1) granted motions to vacate the decisions in the Thompson and Cravens cases, (2)

entered agreed decisions in the <u>Cravens</u> cases reflecting the Cravenses' pretrial acceptance of the standard Kersting settlement offer, (3) in the <u>Thompson</u> cases, where the parties were unable to agree on the decisions, entered decisions requested by the Thompsons, and (4) denied a motion to vacate the decision in the <u>Rina</u> case because the testimony and evidence offered by Thompson and Cravens had no material effect on Dixon II as it related to Rina and therefore the Court's findings, analyses, and conclusions relating to Rina would remain the same. The first draft stated that the Internal Revenue Service (IRS) believed that the Court's disallowance of interest deductions and the imposition of the additions to tax would be upheld on appeal. The first draft then stated that the IRS had decided to renew its previous offer of the 7-percent settlement including the "burnout"[5] and enclosed a form on which the taxpayer could indicate his/her acceptance of the offer. The first draft stated

---

[5]The burnout was a change, beneficial to taxpayers, adopted by respondent's trial attorney in giving effect to respondent's pretrial settlement offer for the Kersting project. The burnout applied in cases involving more than 1 tax year. Under the burnout, the interest on a taxpayer's total unpaid Kersting-related deficiencies for the first and second years of tax liability would not begin to accrue until the return due date for the second year. This was accomplished by zeroing out the taxpayer's agreed deficiency for the first year and adding it to the agreed deficiency for the second year. The burnout thus postponed for a year the accrual of interest on the first year's deficiency, thereby reducing the total interest accrued on the taxpayer's Kersting-related deficiencies. Variations of the burnout were used in cases involving more than 2 tax years.

that the offer applied only to adjustments resulting from participation in the Kersting programs and that any other adjustments raised in the case would be settled or litigated item by item.

A second shorter draft of a settlement proposal gave much less detail than the first draft. The second draft (1) referred to the Tax Court's decision but did not name the case or cite Dixon II, (2) identified the <u>Cravens</u> case as one of two test cases in which "some irregular and undisclosed agreements" had been reached, (3) stated that the Tax Court had concluded that the outcome of the trial was unaffected by the irregular activity and that decisions had been entered in the two test cases enforcing the undisclosed agreements, and (4) did not identify any of the other test cases or mention that some of test cases were being appealed. The second draft stated:

> We believe that the Cravens situation is indistinguishable from your own.

> \* \* \* \* \* \* \*

> We have determined that the Cravens [sic] in good faith believed that they had a valid settlement agreement prior to the trial. Because they were not represented by counsel, they could not be expected to have detected any irregularity on our part. Because the Cravens [sic] received the benefit of this offer even after trial, we believe that fundamental fairness compels that you should receive the same treatment. Therefore, we will apply the benefits of that treatment to your case.

The second draft stated that the adjustments to the taxpayer's account with the IRS would be made administratively and required no further action by the taxpayer.

A third draft, also less detailed than the first (1) cited Dixon II, (2) stated that two of the test case petitioners had entered into settlement agreements that had not been disclosed to the other test case petitioners or the Tax Court, (3) did not identify the test case petitioners who had entered into the undisclosed settlement agreements or any of the test cases other than citing Dixon II, (4) stated that the Tax Court had concluded that the outcome of the trial was unaffected by the testimony of the test case petitioners who had settled their cases and that "the opinion of the Tax Court, as it affects you, remains unchanged", (5) did not disclose that the Dixons and some of the other test case petitioners had filed appeals with the Court of Appeals for the Ninth Circuit. The third draft stated that "fundamental fairness dictates that you be afforded an opportunity to settle your case on similar grounds". The third draft, like the second draft, indicated that if the taxpayer's case had been settled, the adjustments would be made administratively without requiring further action from the taxpayer. If the case was still pending in the Tax Court, the taxpayer had 60 days to accept the offer. The third draft stated that acceptance of the offer would "preclude any further

challenges or appeal with respect to the merits of the Dixon

opinion as applied to your case(s)."

In January 1993 respondent made mass mailings extending a

global settlement proposal to all known Kersting project non-

test-case petitioners and their counsel (posttrial settlement

offer).  The posttrial settlement offer informed the non-test-

case petitioners that the Court had issued its opinion sustaining

all the adjustments and cited Dixon II.  It explained that, after

the trial of the test cases:

> It subsequently came to our attention that two of
> the test case petitioners had entered into settlement
> agreements with the Service prior to the trial, and
> that these agreements were not disclosed to the Tax
> Court or the other test case petitioners.  The
> settlement agreements provided that these particular
> test case petitioners could proceed to trial, but would
> receive the benefit of the better of their pretrial
> settlement agreement or the results of the trial.  The
> Tax Court has since been advised of this situation and
> has concluded that the outcome of the trial was not
> affected by the testimony of these test case
> petitioners.  This means that the Tax Court opinion, as
> it pertains to other Kersting cases, remains unchanged.
> However, in light of these recent developments, we have
> concluded that in fairness all petitioners be afforded
> an opportunity to settle their cases.

In general, the posttrial settlement offer represented a

revival of the official project settlement that respondent had

offered during 1982-88.  It permitted taxpayers to resolve their

cases by agreeing to pay deficiencies that were 7 percent less

than those determined in their deficiency notices.  Respondent

would impose no penalties or additions to tax, and taxpayers

would pay interest only at the generally applicable (i.e., non-tax-motivated) rate under section 6621(a).  The posttrial settlement offer did not include the burnout.  The posttrial settlement offer further stated:  "Acceptance of this settlement offer will preclude any further challenge or appeal with respect to the Kersting programs or the merits of the Dixon opinion.  Any other issues involved in this case will be resolved separately."  Taxpayers were given 60 days within which to accept or reject the posttrial settlement offer.

Mr. Hartman had settled his cases with respondent, and stipulated decisions had been entered in his cases in January 1989 before the test cases were tried.  The Lewises, through their counsel, and the Lius, pro sese, accepted respondent's posttrial settlement offer, and stipulated decisions were entered in their cases in March and June 1993, respectively.

In Dixon V at 1046, the Court of Appeals held that the misconduct of the Government attorneys in the test case proceedings was a fraud on the Court that violated the rights of all Kersting project petitioners who had agreed to be bound by the outcome of the Tax Court proceeding, a fraud on both the Kersting project petitioners and the Tax Court "plainly designed to corrupt the legitimacy of the truth-seeking process".  The Court of Appeals ordered this Court to sanction respondent by entering decisions in the cases of the remaining test case

petitioners and other Kersting project petitioners before the Court of Appeals on terms equivalent to those provided in the Thompson settlement.

During the Dixon V remand proceedings, in an order issued October 12, 2004 (the Dixon order), the Court allowed the taxpayers' discovery requests for the limited purpose of ascertaining respondent's understanding of the origins and nature of the Thompson settlement. Evidence of the conduct of respondent's management after Dixon II was excluded because it was not relevant to that purpose.

As part of the limitations on discovery in the Dixon V remand proceedings, the Court took custody of three boxes for in camera inspection. Two boxes described in item 123 of respondent's privilege log consisted of a chronological file of 16 volumes comprising more than 1,200 items and 5,000 pages created and maintained by respondent's counsel Henry E. O'Neill. The three drafts of the posttrial settlement offer were included in item 123.

After we completed the inspection, we ordered respondent to produce more than 200 items from the third box (all documents encompassed by respondent's privilege log except item 123) as relevant to the origins and nature of the Thompson settlement. We denied the taxpayers access to the item 123 materials because they provided no guidance on the scope of the Thompson settlement

and were not relevant to the Dixon V remand. In note 2 of the Dixon order, however, we noted that materials in item 123 raised questions regarding the adequacy of respondent's disclosure of the Government attorneys' misconduct and that we might require production of those materials later in connection with motions to vacate decisions in which stipulated decisions had been entered. See also Dixon VIII n.9. The Court retained custody of the materials encompassing item 123 of the privilege log.

In Dixon VI and Dixon VIII we responded to the directions and primary mandate of the Court of Appeals in Dixon V to determine how the Thompson settlement would be imposed against respondent in favor of the test case petitioners and all parties properly before the Court. Kersting project petitioners filed notices of appeal of Dixon VI and Dixon VIII in the test cases of Hongsermeier v. Commissioner, docket No. 29643-86, Young v. Commissioner, docket Nos. 4201-84, 22783-85, and 30010-85, and Owens v. Commissioner, docket No. 40159-84, and in the nontest cases of Rogers v. Commissioner, docket No. 17993-95, Huber v. Commissioner, docket No. 20119-84, Titcomb v. Commissioner, docket No. 17992-95, and Adair v. Commissioner, docket Nos. 17642-83, 38965-84, 35608-86, 479-89, and 8070-90 (collectively the Hongsermeier appeal).

After the Court of Appeals issued Dixon V, petitioners and others filed motions for leave to file motions to vacate the

stipulated decisions entered by this Court in their cases. Petitioners premised their motions to vacate the decisions in their cases on two grounds. First, petitioners argued that the decisions in their cases were obtained by fraud on the Court because, inasmuch as petitioners were bound by the decisions in the test cases, the fraud committed by the Government attorneys in the test cases necessarily affected and corrupted their cases, and their settlement agreements did not address the fraud or foreclose the imposition of sanctions against respondent for the fraud. Second, petitioners argued that there was misconduct of respondent's management in making the posttrial settlement offer, that such misconduct constituted a new fraud on the Court or continued the fraud on the Court determined by the Court of Appeals in Dixon V, and that respondent obtained the stipulated decisions through that misconduct.

In Lewis v. Commissioner, T.C. Memo. 2005-205, we focused on the legal consequences of the Lewises' acceptance of respondent's posttrial settlement offer, applying general principles of contract law. We denied the Lewises' motions for leave to file motions to vacate their stipulated decisions on the grounds that they and their counsel had become aware of the Government attorneys' misconduct and of the pending appeals by test case petitioners when they stipulated the decisions.

The Lewises filed motions for reconsideration, which we granted because we had come to believe that in Lewis we had applied the wrong law, as the Court of Appeals in Dixon V held we had in Dixon III and Dixon IV, and that we failed to appreciate and apply the full scope of the holding of Dixon V in accordance with its rationale. We also granted the motions for leave to file motions to vacate decisions in the Lewis, Hartman, and Liu cases. We consolidated the cases because they would all be appealable to the Court of Appeals for the Ninth Circuit.

When we granted petitioners leave to file motions to vacate the decisions in these cases we thought that further proceedings might be necessary to decide whether respondent's conduct following the trial of the test cases constituted a fraud on the Court warranting additional sanctions against respondent. We ordered respondent to show cause in writing why the matter should not be set for evidentiary hearing.

Respondent filed a response to the Court's order to show cause, opposing the scheduling of an evidentiary hearing on this matter; respondent took the position that the Court had before it the entire evidentiary record in Dixon III and Dixon VI upon which to decide the merits of the motions to vacate. Respondent asserted that petitioners' motions could be decided on the Dixon VI record and that another evidentiary hearing would yield only a

rehash of the evidence already before the Court and unnecessarily delay bringing the Kersting project to a close.

In considering the parties' positions regarding further discovery and an evidentiary hearing, we took counsel from the Court of Appeals in Dixon V at 1047, where it said: "Enormous amounts of time and judicial resources have been wasted.  * * *  The taxpayers should not be forced to endure another trial and the IRS should be sanctioned for this extreme misconduct."  We believed that another hearing, including full discovery, in these cases should be avoided if possible.

In an order of the Court dated October 31, 2006 (the October 31 order), we informed the parties that we had considered petitioners' arguments and agreed that the Court of Appeals in Dixon V has determined that the fraud the Government attorneys committed on the Court in the test case proceedings affected and corrupted every case that was bound by Dixon II, whether by piggyback agreement or otherwise.  However, a holding to that effect alone would not resolve the pending motions.  We expressed concern that respondent's current counsel and some of petitioners' counsel would be witnesses and would have to withdraw from the proceedings if an evidentiary hearing were necessary.  We asked the parties to address whether petitioners' motions could be decided without a hearing and posed several questions to the parties, including:

1.  Once the Government trial attorneys had committed fraud on the Court, could respondent "purge" the fraud from any cases bound by the test cases and, if so, what action was respondent required to take in order to do so?

2.  Did respondent have a duty to notify petitioners, fully disclose the misconduct to them, and inform them that Dixon II was being appealed and the taxpayers were asserting fraud on the Court?  By holding that the remedy for the fraud on the Court was to entitle all Kersting project petitioners with open cases to the benefits of the Thompson settlement, did the Court of Appeals in effect require the IRS to make the same disclosure to the Kersting project petitioners that this Court had required the IRS to make in Fisher v. Commissioner, T.C. Memo. 1994-434?

3.  When making the posttrial settlement offer, did respondent continue the fraud on the Court or commit a new fraud by failing to disclose fully to petitioners the Government attorneys' misconduct in the test case proceedings and the taxpayers' allegations, on appeal, of fraud on the Court?

4.  If such disclosures were required, did respondent's filing with the Court of the stipulated decisions obtained without the disclosures constitute a fraud on the Court?  See e.g., Toscano v. Commissioner, 441 F.2d 930, 935 (9th Cir. 1971) ("the original fraud was not upon the Tax Court * * * When * * * Toscano petitioned the Tax Court for redetermination, he carried

the fraud into the Tax Court.  Thus he was continuing to defraud the Commissioner * * * But he was doing more; he was also perpetrating a fraud upon the Tax Court"), vacating 52 T.C. 295 (1969).  Did respondent have an obligation to file the form of settlement offer letter with the Tax Court when he asked the Court to enter the stipulated decisions obtained through that offer?

5.  Was our holding in Lewis v. Commissioner, T.C. Memo. 2005-205, analogous to requiring taxpayers to show prejudice as a result of the misconduct such that, under the holding of Dixon V, we applied the wrong law?

6.  Respondent acknowledged that Kersting project petitioners whose stipulated decisions were procured and entered after the publication of Dixon II and before the discovery and disclosure to the Court of the misconduct of respondent's attorneys are entitled to have their decisions vacated, thereby conceding that stipulated decisions should be vacated because of fraud on the Court.  Are stipulated decisions entered before the publication of Dixon II also subject to being vacated for fraud on the Court?  Were petitioners who settled their cases before the publication of Dixon II entitled in so doing to assume that the test cases would be tried properly?

We stated that we believed that the answers to the questions might eliminate the need for a hearing to establish facts

concerning the posttrial conduct of respondent's management. The Court sought the views of the parties and their counsel on the questions posed and ordered petitioners and respondent to file responses to the order addressing the Court's questions with legal reasoning and citations and discussions of legal authorities to support their views.

In the October 31 order we also quoted the posttrial settlement offer that led to most of the stipulated decisions that petitioners sought to vacate and commented on material facts that had been omitted. We stated that there was no need to hold an evidentiary hearing to conclude that in a number of respects respondent's settlement offer constituted less than full disclosure and was misleading.

In the October 31 order we also pointed out that evidence of alleged continuing misconduct by respondent's management and representatives following the trial of the test cases had been excluded from all evidentiary hearings. We specifically noted our prior Dixon order and stated: "Footnote 2 of the Dixon order clearly indicates that the Court believed that item 123 was relevant to allegations of respondent's misconduct raised by petitioners in the pending motions."

In an order dated November 15, 2006 (the November 15 order), we posed an additional question, arising from respondent's concession in Kahle v. Commissioner, docket Nos. 24558-84 and

38976-84, where the stipulated decisions entered in the cases had been negotiated after the trial of the test cases, been executed after Dixon II was issued, and become final before respondent discovered and disclosed to the Court the misconduct of the Government attorneys. In response to an earlier order to show cause, respondent stated that respondent did not oppose vacating the stipulated decisions entered in the Kahle cases, conceding that the decisions in those Kahle cases were arguably obtained by a fraud on the Court. In the November 15 order, the Court ordered petitioners and respondent to address the implications of that concession insofar as it affected stipulated decisions that were entered and/or became final before the Cravenses and the Thompsons settled their cases, (2) after the Cravenses and the Thompsons settled their cases but before the trial of the test cases, and (3) after the trial of the test cases but before publication of Dixon II.

The parties timely filed their responses to the October 31 and November 15 orders. Although respondent and petitioners took opposing positions on every question, we still wished to avoid another expensive and lengthy hearing that might require respondent's and petitioners' counsel to withdraw.

After considering the parties' positions, we concluded that admitting into evidence the three drafts of the posttrial settlement offer, which spoke for themselves, would eliminate the

need for a hearing.  Because we had indicated to respondent in the <u>Dixon</u> order and the October 31 order that documents in item 123 were relevant to the issues in these cases, we ordered that the three drafts of the posttrial settlement offer be marked for identification and received into evidence in these cases as the Court's Exhibits 1-A, 2-B, and 3-C.

In Hartman I we held that the fraud on the Court committed by the Government attorneys in the test case proceedings was a fraud on the Court in all cases bound by the outcome of the test cases and granted the motions to vacate filed by the Lewises, Mr. Hartman, and the Lius.  We held further that all Kersting project petitioners against whom stipulated decisions were entered on or after June 10, 1985, are entitled to the benefits of the Thompson settlement, thereby imposing on respondent in all Kersting project cases the sanctions mandated by the Court of Appeals in Dixon V.  We concluded Hartman I by describing a procedure for implementing our holding.

Respondent moves the Court to reconsider Hartman I in the following respects, which we have regrouped to reflect the order in which we will address them:  (1) Reverse all factual findings that were based on item 123 concerning communication of the posttrial settlement offer, (2) strike from the Court's opinion findings of continuing fraud on the Court beyond the original misconduct of the Government attorneys in the test case

proceedings, (3) delay implementation of any sanctions in these cases until after the Court of Appeals issues its mandate in the Hongsermeier appeal (the Hongsermeier mandate), and (4) substitute respondent's alternative plan for implementing the sanction.

Petitioners move the Court to reconsider the method of implementing the sanctions and to extend the sanction to participants in the Kersting tax shelters who never filed a petition in the Tax Court to contest the deficiencies determined against them.

### Discussion

The granting of a motion for reconsideration rests within the Court's discretion. Estate of Quick v. Commissioner, 110 T.C. 440, 441 (1998); see Lucky Stores, Inc. & Subs. v. Commissioner, T.C. Memo. 1997-70, affd. 153 F.3d 964 (9th Cir. 1998). A motion for reconsideration will be denied absent a showing of unusual circumstances or substantial error. Estate of Quick v. Commissioner, supra; Alexander v. Commissioner, 95 T.C. 467, 469 (1990), affd. without published opinion sub nom. Stell v. Commissioner, 999 F.2d 544 (9th Cir. 1993).

I.  Findings Concerning Formulation and Communication of Posttrial Settlement Offer

Respondent moves the Court to reconsider Hartman I to reverse all factual findings that were based on item 123 concerning formulation and communication of the posttrial

settlement offer.  Respondent asserts that the Court's actions in making drafts of the pretrial settlement offer part of the record without allowing respondent an opportunity to challenge the evidence or present evidence in opposition are inconsistent with due process and the fundamental rights of litigants.

The three drafts of the proposed posttrial settlement agreement were documents in respondent's records and were received into evidence in these cases as the Court's Exhibits 1-A, 2-B, and 3-C.  In our view, the progression of the three drafts of the proposed posttrial settlement agreement included in item 123 evidenced efforts by respondent's management to provide Kersting project petitioners with less rather than more information.  That progression was relevant to (1) our consideration of whether and to what extent respondent had an obligation to disclose to non-test-case petitioners the facts surrounding the Government attorneys' misconduct during the test case proceedings, (2) whether respondent's management misled petitioners or concealed from them facts concerning the misconduct of the Government attorneys during the test case proceedings, and (3) whether the actions taken by respondent's management after discovery of the Government attorneys' misconduct might have mitigated the harm caused by the misconduct.

In our view, the mitigating effect of the posttrial settlement offer could not be properly evaluated without consideration of the three drafts. The drafts were documents in respondent's records subject to discovery that were properly includable in the record in these cases. We had indicated to respondent in the <u>Dixon</u> order and the October 31 order that documents in item 123 were relevant to the issues in the motions to vacate. Because the drafts speak for themselves, we ordered them received into evidence as the Court's exhibits, rather than setting the matter for a hearing and commencing discovery procedures. In so doing, we avoided the need for additional discovery and an evidentiary hearing, which respondent vehemently opposed. Petitioners, who had requested a hearing, have no objections to the exhibits.

Respondent's request that the Court reverse all factual findings that were based on item 123 on the issue of respondent's intent in formulating and communicating the posttrial settlement offer is denied.

II.  <u>Continuing Misconduct Beyond the Fraud on the Court of the Government Attorneys During the Test Case Proceedings</u>

Petitioners premised their motions to vacate the stipulated decisions in their cases on two alternative grounds:  First, that those decisions were obtained by fraud on the Court because petitioners were bound by the decisions in the test cases, the fraud committed by the Government attorneys in the test cases

necessarily affected and corrupted their cases, and their settlement agreements did not address the fraud or foreclose the imposition of sanctions against respondent for the fraud; second, that there was misconduct of respondent's management in making the posttrial settlement offer, that such misconduct constituted a new fraud on the Court or continued the fraud on the Court determined by the Court of Appeals in Dixon V, and that respondent obtained the stipulated decisions through that misconduct.

We emphasize that we did not decide Hartman I on the second ground advanced by petitioners. We would not have done so without affording respondent's management a further hearing. We decided Hartman I on the first ground on the basis of the existing record in the Dixon cases supplemented with the drafts of the posttrial settlement offer without further discovery or an evidentiary hearing. We held that the Government attorneys in the test case proceedings had committed a fraud on the Court in every case that was bound by the Kersting project test cases, under the rationale and holding of the Court of Appeals in Dixon V. The only fraud committed on the Court was the fraud committed by respondent's trial attorneys in the test cases in soliciting, entering into, and concealing the settlement of the Thompson and Cravens cases.

In Hartman I we focused on whether respondent's posttrial disclosure and settlement offer could purge from these cases the fraud committed on the Court by respondent's trial attorneys or otherwise rectify the harm caused by the fraud on the Court. We noted that, once a fraud is committed, subsequent voluntary disclosure of the fraud does not purge the fraud. Badaracco v. Commissioner, 464 U.S. 386, 394 (1984). The fraud on the Court committed by respondent's attorneys was completed once the test cases were tried. We held that, regardless of respondent's disclosures to the Court, all Kersting project cases that were bound by the test cases during the test case proceedings remain cases of fraud on the Court, and respondent remains subject to sanction for that fraud in every such case.

In deciding whether the sanction mandated by the Court of Appeals in Dixon V should be applied in the cases of Kersting project petitioners who accepted respondent's posttrial settlement offer, we considered whether respondent's posttrial actions mitigated the harm done by the fraud. For that purpose, we identified respondent's obligations to such petitioners and found (1) that respondent was obligated to inform Kersting project non-test-case petitioners of the existence and terms of the Thompson settlement and that Dixon II was being appealed and (2) that respondent intentionally omitted those material facts in the posttrial settlement offer.

In the motion for reconsideration respondent argues that section 6103 prohibited respondent from disclosing the terms of the Thompson settlement agreement to non-test-case petitioners. We disagree. Section 6103(h)(4) permits disclosure of return information in judicial and administrative tax proceedings. The Thompsons were petitioners (parties) in test cases that determined their civil tax liabilities, see sec. 6103(h)(4)(A), and the treatment of the disallowed Kersting deductions claimed on the Thompsons' returns was directly related to the resolution of that issue in every case bound by the outcome of the test cases. The section 6103(h)(4) exception to nondisclosure permitted disclosure of the Thompson settlement to petitioners whose cases were bound by the Thompsons' cases. Moreover, the decision documents in the Thompsons' cases disclosed the settlement. The decision documents in a Tax Court case are public records, open for inspection by the public. Respondent had an obligation to fully disclose the agreement to the non-test-case petitioners.

In Hartman I we observed that (1) willful concealment or omission of material facts or intentional statements of half-truths will support a finding of fraud, (2) respondent, having disclosed some of the facts concerning the irregularities in the test case procedure, was obliged to disclose all facts that would materially qualify the limited facts that were

disclosed, and (3) the Court has held that a settlement stipulation may be set aside for excusable, damaging reliance upon a false or untrue representation of the other party. Again, we made those observations in deciding whether respondent's posttrial settlement offer somehow mitigated the harm done by the fraud committed by respondent's attorneys in the test case proceedings. We did not hold that respondent's failure to satisfy respondent's obligation to inform or omission of material facts was a fraud on the Court. Nor did we hold or conclude that respondent's omissions in formulating and proffering the posttrial settlement offer evidenced a "scheme of secrecy" to hide the Thompson settlement; we limited our use of that term, see Hartman I, slip op. at 119-120, to the concealment of the Thompson settlement that constituted the fraud on the Court by respondent's trial attorney and his supervisor.

We also found that the stipulated decisions and the posttrial settlement agreement did not specifically release respondent from liability for matters arising from the misconduct.

In Hartman I we held that sanctions should be imposed in the cases of all Kersting project petitioners in which stipulated decisions were entered on or after June 10, 1985, the date the Kersting project test case proceedings began, by extending the benefit of the Thompson settlement to all such petitioners.

Since we did not find a continuing fraud on the Court beyond that committed by respondent's trial counsel during the test case proceedings, there are no findings to strike from Hartman I. Respondent's request is moot.

III. Modification and Delay of Implementation of Sanctions

In Hartman I we recognized that "Enormous amounts of time and judicial resources have been wasted" and hoped to relieve other Kersting project non-test-case petitioners who had stipulated decisions entered in their cases on or after June 10, 1985, of the burden of filing motions for leave to file motions to vacate decisions.  It appeared to the Court that respondent could adjust administratively such petitioners' accounts, as had been done in the Kahle cases after those decisions had become final.  We believed that the most expeditious and efficient means of implementing the sanction would be to allow respondent to adjust administratively the accounts of all Kersting project petitioners, other than Mr. Hartman, the Lewises, and the Lius, without requiring further action from the Kersting project petitioners.

To facilitate the implementation of the sanction, we proposed to issue an order (the implementation order) directing respondent to send a copy of Hartman I and the implementation order to all taxpayers who had filed petitions in this Court contesting the adjustments at issue in Dixon II and who had

stipulated decisions entered in their cases (closed cases) on or after June 10, 1985. That notification action by respondent was to be completed within 60 days after the decisions entered in these cases become final, i.e., after the Court of Appeals for the Ninth Circuit renders its decision, if and when the decisions herein should be appealed. Respondent would have 9 months after the date the decisions in these cases become final to adjust administratively the accounts of all Kersting project petitioners who had stipulated decisions entered in their cases on or after June 10, 1985.

Respondent asks the Court to delay entry of decisions in these cases and the implementation of sanctions in the closed cases until the Court of Appeals for the Ninth Circuit has issued the Hongsermeier mandate and to modify the implementation of sanctions.

We first address respondent's request that we delay implementation of the sanctions.

A. Delay of Entry of Decisions in the Hartman, Lewis, and Liu Cases

Respondent first requests that the Court delay entry of decisions in these cases, the Hartman, Lewis, and Liu cases, until after the Court of Appeals issues the Hongsermeier mandate.

We held in Hartman I that the administrative adjustment procedure would not be implemented until the decisions in these cases are final. These cases will not become final until any

appeal by petitioners or respondent is complete, presumably after or simultaneously when the Court of Appeals issues the Hongsermeier mandate.  We do not believe the decisions in these cases should be postponed; a postponement would unnecessarily delay any appeal in one or more of these cases.  The Court will order decisions in these cases to be submitted under Rule 155 within 30 days after the filing of this supplemental opinion.  If respondent and petitioners in any of these cases agree that neither party will file an appeal in the case and that both parties want to delay entry of decision until after the Court of Appeals has decided the appeal of any of the other of these consolidated cases and the Hongsermeier appeal, the Court will extend the date for filing the Rule 155 computation until that time.

B.  Delay of Implementation of Sanctions in Closed Cases Until After Court of Appeals Has Decided Cases Currently on Appeal From Dixon VI and Dixon VIII

Implementation of the sanctions in other cases was to begin by notification from respondent to affected Kersting project petitioners.  The notification was to be completed within 60 days after the decisions entered in these cases had become final; i.e., after the Court of Appeals for the Ninth Circuit renders its decision, if and when the decisions herein should be appealed.  Respondent asks the Court to delay implementation of

the sanction until after the Court of Appeals has decided the cases currently on appeal from Dixon VI and Dixon VIII.

In setting the deadlines for implementing the sanction, we did not expect that the decisions in the cases at hand might become final before the Court of Appeals decided the Hongsermeier appeal. Upon reconsideration, we believe that implementation of sanctions in closed cases other than these cases should not commence until the later of (1) the last date a decision in any of these cases become final, (2) the date the Court of Appeals for the Ninth Circuit renders its mandate in any of these cases, if and when the decisions herein should be appealed, and (3) the date of the Hongsermeier mandate.

C.    Modification of Implementation of Sanctions

Respondent asks the Court to modify the Court's method of implementing the sanction. Respondent, citing section 6512, argues that the Court "lacks jurisdiction to order overpayment refunds with respect to closed cases when the final decisions have not been vacated". In Hartman I we did not hold that we would order respondent to make the administrative adjustments-- we held that we would issue the implementation order giving respondent the opportunity to adjust administratively the accounts of the petitioners in closed cases before acting on any motions to vacate decisions in other closed cases or accepting any new motions in closed cases where motions had not as yet been

filed.  Respondent asserts that the adjustment to Mr. Kahle's account in the Kahle cases did not result in a refund of an overpayment of tax and that section 6512(a) prohibits respondent from making a refund in the closed cases by adjusting administratively the accounts of the petitioners in closed cases.[6]

Respondent argues that the Court has made no determinations of overpayment of tax with respect to the approximately 800 closed cases and section 6512(a) prohibits respondent from issuing refunds administratively.  Instead, in order for respondent to comply, the Court must vacate the decisions and determine the amounts of the overpayments.

To facilitate implementation of the sanction, we shall issue the following implementation order.

     1.  Status Reports Identifying Affected Closed Cases

        a.  On or before 90 days after the date this supplemental opinion is filed, respondent shall file with the Court a status report (the first status report) listing all cases

---

[6]If the Commissioner has mailed a notice of deficiency to a taxpayer for a tax year and the taxpayer has filed a timely petition with the Court, sec. 6512(a) prohibits the Commissioner from making a refund or credit for that taxable year except as to, inter alia, an overpayment determined by a decision of the Tax Court which has become final.  The Court has jurisdiction to determine the amount of an overpayment of tax for a taxable year, and the amount so determined by the Court shall, when the decision of the Court becomes final, be credited or refunded to the taxpayer.  See sec. 6512(b)(1).  Sec. 6512(b)(3) limits the amount of any such credit or refund to the portion the Court determines was paid after the mailing of the notice of deficiency or within the applicable look-back period.

of the petitioners who filed petitions in this Court contesting the adjustments at issue in Dixon II who had stipulated decisions entered in their cases on or after June 10, 1985, that became final before the Court filed Dixon VI and Dixon VIII (the affected closed cases) by caption and docket number and, if then known to respondent, the current addresses of the petitioners in the cases and any counsel of record. In the first status report respondent shall identify those cases in which respondent agrees the sanctions may be applied and those in which respondent contends the sanctions may not be applied with a brief explanation of respondent's basis for excluding each case to be excluded;

b. Respondent shall continue to search for the current addresses for the petitioners in the affected closed cases. In each affected closed case where the petitioners were represented by counsel, respondent shall contact the counsel of record in an attempt to verify that the representation is current. On or before 30 days after filing the first status report, respondent shall file a second status report, providing the current addresses of those petitioners and the names and addresses of any counsel of record not provided in the first status report. Respondent shall submit additional status reports on respondent's continuing efforts to identify the petitioners' current addresses and counsel of record in the affected closed

cases every 30 days until all addresses and counsel of record have been identified and provided to the Court;

      2.   <u>Sanction Notice to Petitioners in Affected Closed Cases</u>

On or before 60 days after the later of (1) the last date a decision in any of these cases becomes final, (2) the date the Court of Appeals for the Ninth Circuit renders its mandate in any of these cases, if and when the decisions herein should be appealed, and (3) the date of the <u>Hongsermeier</u> mandate, respondent shall send a notice to the petitioners in all the affected closed cases of the imposition of a sanction in cases bound by the Kersting project test cases (sanction notice). In the sanction notice, respondent shall:

      a.  Provide the petitioners with a brief synopsis of the background and opinions imposing the sanction on respondent.

      b.  Rather than providing copies of Hartman I and this supplemental opinion, provide links to the Opinions search file on the Court's Web site.[6]

      c.  When possible, respondent shall compute the proposed adjustments to tax in the petitioners' case(s) and inform the petitioners of the result (i.e., the estimated amount of overpayment or balance due).

---

[6]For example, the link to Hartman I is http://www.ustaxcourt.gov/InOpHistoric/Hartm8an.TCM.WPD.pdf.

d.   Inform the petitioners that the sanction need not be applied in their case if it would be detrimental to them.

e.   Inform the petitioners that, if they wish to have the sanction applied in their case, respondent will file with the Tax Court a motion for leave to file a motion to vacate the decision(s) in their case(s) and a motion to vacate the decision(s).

f.   Request that the petitioners inform respondent within 60 days of their decisions either to have the sanction applied in their case or to waive the sanction.

g.   Include the name of IRS contact personnel who can answer any questions the petitioners may have concerning the imposition of the sanction in their cases.

3.   Status Reports on Responses to Sanction Notice

On or before 90 days after respondent sends the sanction notice to the petitioners in the affected closed cases, respondent will file a status report with the Court reporting on the responses received, listing those case in which sanctions are expected to be applied, those in which the petitioners waived application of the sanctions, and those in which no response was received.  Respondent shall attach to the status report for the Court's records all responses where the petitioners waived the sanction and requested that it not be applied to their cases.

D.   Motions for Leave To File Motions To Vacate Decisions in Affected Closed Cases

In each case in which the petitioners have requested that the sanction be applied in their affected closed case, respondent shall file a motion for leave to file a motion to vacate the decision in the case and a motion to vacate the decision. Respondent shall attach the petitioners' request to the motion for leave.  Upon receipt of the motion, the Court will grant the motion and order the decision in the case vacated.

The parties shall work expeditiously to prepare and execute new decisions (and overpayment stipulations, as appropriate) reflecting the revised liabilities after application of the Thompson settlement and, within 90 days after the order to vacate, shall submit the new decision for the Court's review and entry.  If the parties are unable to reach agreement with respect to the new decision documents, the parties will submit their respective positions to the Court for resolution within 120 days of the order to vacate.[7]  See Rule 155.

In addition to motions filed in these cases, motions for leave to file motions to vacate stipulated decisions have been filed in 66 other affected closed cases.  In Hartman I we held that we would not act on those motions, so that respondent could

---

[7]Respondent cautions that disputes might arise if the existing records are incomplete, creating uncertainty as to the computation of the revised deficiencies and/or payment history.

have an opportunity to adjust the accounts administratively. Because respondent cannot adjust the accounts administratively and the Court must vacate the decisions in the affected closed cases, the Court will grant leave to file the motions to vacate decisions in cases where motions for leave have been filed and will accept for filing and grant any motions for leave to file motions to vacate the decisions in other affected closed cases.

E.   Cases That Will Remain Closed

The Court will not take any action in any cases in which the petitioners either did not respond or sent a negative response; those cases will remain closed.

IV. Petitioners' Motion

In Hartman I we held that the fraud on the Court committed by respondent's attorneys in the Kersting project test cases violated the rights not only of the test case petitioners but of every petitioner whose case was bound by the outcome of the test cases.  The fraud committed by the Government attorneys was a fraud on the Court in every one of the more than 1,800 Kersting project cases filed in this Court.  Extending the benefit of the Thompson settlement to all Kersting project petitioners who were part of the Kersting project test case procedure is the sanction that in Dixon V the Court of Appeals deemed appropriate and necessary to restore the confidence of future litigants who may become involved in test case proceedings.  In Hartman I we held

that the Dixon V sanction should be applied to give the same relief to all Kersting project petitioners whose cases were part of the Kersting project test case proceedings.

In petitioners' motion for reconsideration, petitioners' counsel, in essence, ask the Court to extend the sanction to taxpayers who participated in the Kersting tax shelters and had deficiencies arising from the disallowance of their claimed deductions and who either never filed a petition in this Court or filed a petition in this Court but settled their cases before the test case proceedings began. We cannot do so because (1) the fraud committed on the Court did not extend the time for filing a petition after a notice of deficiency had been issued, and the Court never acquired jurisdiction over those taxpayers or their deficiencies, (2) a taxpayer who did not file a petition in this Court did not have a case in this Court to which the fraud on the Court committed by the Government attorneys in the test case proceeding could have attached, (3) the Court invoked its inherent power to impose a sanction against respondent for the harm done to the judicial process, namely the test case proceedings in this Court, which did not involve taxpayers who were not part of those proceedings, and (5) the Court's inherent power is limited to imposing the sanction in those cases in which a fraud on the Court was committed and does not extend to cases in which no fraud was committed--i.e., those cases that settled

before the test case proceedings began--or where there was no case.

Petitioners' motion for reconsideration will be denied.

To give effect to the foregoing,

<u>Appropriate orders will be issued, and decisions will be entered under Rule 155</u>.